NUMBER 13-00-691-CR

 

                             COURT OF APPEALS

 

                   THIRTEENTH DISTRICT OF TEXAS

 

                                CORPUS CHRISTI

 



 

RAFAEL WILLIAMS,
A/K/A                                                     Appellant,

RAPHAEL B. WILLIAMS, JR.

                                                   v.

 

THE
STATE OF TEXAS,                                                          Appellee.

 



 

                        On appeal from the 105th District Court

                                  of Nueces
County, Texas.

 



 

                                   O P I N I O N

 

                      Before Justices Dorsey, Yañez, and Castillo

                                  Opinion
by Justice Castillo








Appellant Rafael
Williams was charged by indictment with two counts of aggravated robbery.[1]  He was convicted by a jury of the
lesser-included offense of class B misdemeanor theft[2]
as to count one and acquitted as to the second count.   After the pronouncement of the verdict, the
State and appellant agreed to a punishment of 180 days in jail which the trial
court assessed pursuant to the agreement.[3]   Williams raises three complaints on appeal:
1) the trial court erred in overruling his Batson[4]
challenges; 2) he was denied his right to confrontation by the admission of
certain hearsay statements; 3) the evidence was factually insufficient to
establish the intent to commit theft.  We
affirm.

Factual Background

Because appellant
challenges the factual sufficiency of the evidence to support his conviction,
we review the evidence presented at trial in some detail.













George Ramirez, an
asset protection specialist for the Target store in Corpus Christi, Texas,
testified that on November 18, 1999, he was on duty and noticed appellant walk
into Target pushing a cart that already contained a brown JC Penney=s bag.  Ramirez followed appellant and saw him Ascoping@ out the store to
determine if anyone was in the front or watching the doors as he headed toward
the men=s department.  Appellant selected a red shirt, placed it on
top of the cart and headed to the electronics department where he selected two
Walkmans, walkie-talkies, and a pair of binoculars. After leaving the electronics
department, he selected three packs of batteries.  Appellant noticed Ramirez and asked him if he
worked for Target and Ramirez answered in the negative.   Appellant asked again and Ramirez again said
no.  Appellant then moved to the hardware
area and while there picked up the JC Penney=s bag and put all of the items from the
electronics department into the bag.[5]  He then hid the bag behind some gas tanks in
the aisle.  Leaving the bag there, he
went to the front of the store, stopped at the jewelry department, looked
toward the front of the store and all around and then came back to where the
bag was hidden.  He picked up the bag,
placed it in the cart, stopped and again looked toward the front, pushed the
basket toward the front, picked up the bag and walked rapidly toward the front
doors.          When
appellant Ahit the front doors
past the alarm system,@going through the
sensors,  Ramirez, who had been behind
and to the side of appellant, got in front of him, took out his security badge
and identified himself as Target security. 
Appellant pushed Ramirez with his hands and then walked backward into
the store saying, AHey man, I never left
the store.@  Appellant then swung the bag at Ramirez who
blocked it, bursting it and sending the contents flying.  Appellant continued to walk backward and ran
into one of the employees and then ran in between some lanes.  Ramirez saw him swinging his arms but did not
see anything in his hands.  Appellant ran
into one of the shoppers and yelled at him to get out of the way.   Someone then knocked appellant down and
someone was yelling that appellant had a knife. 
Appellant was struggling and resisting. 
Ramirez testified that there was no store videotape of the particular
incident because of the way the cameras were set up that day and also stated
that he did not recall the alarms going off. 
He admitted that Target directives required that the front entrance be
recorded 24 hours a day and the videotapes retained for 30 days.

Another Target
employee, Carlos Ayala, testified that he was called to the front to help with
a shoplifter and he waited in the front of the store until the described person
came, which he identified as appellant. 
When appellant approached the door, Ayala waited for instructions and
was told to wait until appellant had crossed the door or until the alarm went
off.   According to Ayala, when appellant
Afinally went out the
door,@ George Ramirez made
contact with him at the door and told him to stop.  Appellant backed away, waving his arms
telling people to stay back and not touch him, and then started going through
the lanes, running toward the middle of the lanes, with employees chasing him.
Then customers took matters into their own hands and tackled appellant.  One man who was on top of appellant told the
others to get away because appellant had a knife in his hand.  Eventually someone got control of appellant=s hands and got the
knife away and then got him up. 








Bradley Barnes
testified that he and his wife were in Corpus Christi for shopping purposes on
the day in question.[6]   While they were in the Target parking lot,
they noticed appellant who was walking into Target and had walked right in
front of their truck, causing them to nearly hit him.  Barnes commented in surprise to his wife
about the man=s actions.  They then parked and went inside Target and
Barnes went to get some popcorn.  After
buying the popcorn, he saw the same man he had seen outside coming toward him
with a security officer behind him. 
According to Barnes, both men were walking rapidly and appellant hurried
past him, nearly running into Barnes but missing him by about four or five
inches as appellant hurried straight to the exit doors.  Barnes then looked up and saw appellant turn
back and take off running and the bag on the ground.  Appellant ran into Barnes and went about four
more feet.  The doors were Astopped@ so appellant could
not proceed out.  Appellant stopped and
turned toward the security officer and waved his hand back and forth with some
object in it that Barnes thought was a knife. 
Barnes wanted to help stop appellant but at that time appellant ran back
as if he was going back into the store, running between two registers.  Barnes and a man in the aisle ultimately
tackled appellant.  Barnes testified that
after he had tackled appellant, appellant kept trying to cut him with the knife
and get up.  Barnes kept pushing him down
and  telling him to drop the knife.  Eventually appellant let go of the knife and
Barnes handcuffed him. 








The asset protection
team leader for Target at the time of the incident, Adrian Gonzales, testified
as to the layout of the store, explaining it using a videotape offered into
evidence by the defense.  He also
testified that there was a videotape of the incident and he had personally
viewed it and labeled it and placed it in a small room in the asset protection
office where they retained videotapes. 
Gonzales had established a policy of retaining the videotape of any
altercation for at least eighteen months. 
He could not say whether George Ramirez had seen the tape.  Gonzales had not told the police or the
district attorney=s office of the tape
but he had told a supervisor.  He further
explained there had been two tapes but the only one retained was the eight hour
videotape. 

Gonzales also
testified that, at the time of the incident, he had been in the asset
protection office and heard a commotion. 
He saw George Ramirez standing at the front with appellant maybe a foot
or two from the exit doors.  Appellant
was closer to the front doors.  Ramirez
was asking appellant to come to the asset protection office, but appellant
refused.  Appellant appeared to be acting
abnormal as if he was Aon something.@  This disturbed Gonzales so he asked a few
Target team members to come and assist in the apprehension.  For no apparent reason, appellant suddenly
started running toward the front checkout lanes.  Appellant got to the main aisle and then
turned and started to run back to the front doors when Gonzales and Barnes
grabbed him and put him on the ground to try to handcuff him.  Gonzales was nervous because appellant had
his hands in front of him and Gonzales could not see them.  Then Gonzales saw the box cutter and told
people to watch out because appellant had a knife. Gonzales told appellant to
let go of the knife and eventually appellant did.  Appellant never tried to stab or gesture at
anyone with the knife. 








          Officer
Thomas Nichols of the Corpus Christi Police Department testified that when he
arrived at Target, in response to a call of a disturbance with a shoplifter, he
found three to four employees on top of appellant, who was struggling with
them, kicking and fighting.  Appellant
was bloodied from cuts to both of his thumbs. 
A box cutter knife, or Azip knife@ was obtained from the
scene. 








Appellant testified
that he had gone shopping at Target that day and had brought a cart from
outside the store that happened to already have a bag in it.  He picked out a shirt, some binoculars and
walkie-talkies and then saw George Ramirez. He asked Ramirez if he worked for
the store because he wanted to find out if there were any more walkie-talkies
in the store but Ramirez said he did not, in a way that implied that he was
perturbed to have been asked.  Appellant
testified that he thought he had offended Ramirez so he left the
department.  He continued shopping and
then thought about the fact that he had not discussed such a large purchase
with his girlfriend, so he went and Apreserved@ the items by placing
them in the JC Penney=s bag behind some cans
so he could save them while he went to go talk to his girlfriend.[7]  Appellant testified that he left the store
and was on his way home when he thought that someone might get hold of the
items there and then decided to give the items to a clerk to hold.  He testified that he was walking to the front
with the bag in his hand, on the way to the courtesy desk, when Mr. Ramirez
approached him.  Appellant thought
Ramirez must be stalking him.  According
to appellant, Ramirez said nothing but reached for him and the bag broke and
then a few guys came at him.  Appellant
backed into the store and the next thing he knew, he was thrown to the floor
and his box cutter fell out of his pocket so he grabbed it and pulled it under
him.  A Abig guy@ on top of him kept
kicking him and that jarred his hand and caused the blade to slip out and cut
his thumb, but he held on to it Ain shock.@  Finally, he let go of it.   Appellant testified that he never threatened
anyone or exhibited the knife.   He
carried it because he was a truck driver and often had to cut bands on delivery
boxes.  Appellant acknowledged that he
had twice been convicted of possession of cocaine, in March of 1991 and
February of 1999,[8]
but denied having a problem with cocaine or using cocaine the day of the
incident or any time after February 1999, nine months before the incident.  He testified that his reactions that day were
due to being nervous about the way he was approached by Ramirez at the
store.  He admitted having no cash at the
time but explained he was going to pay for the merchandise with his Discover
card. 

Batson Challenges








Appellant=s first issue
complains of the trial court=s overruling his
challenges to the prosecutor=s peremptory strikes
as to two veniremembers, which appellant claims were struck solely because they
were of African-American descent, as is appellant.  The use of peremptory challenges to
exclude persons from the jury because of their race violates the Equal
Protection Clause of the Fourteenth Amendment.  Batson v. Kentucky, 476 U.S.
79, 84-86  (1986).  Either party may object to the other=s
discriminatory use of a peremptory challenge as a  violation of Equal Protection.  Georgia v. McCollum, 505 U.S. 42,
55-56 (1992).  The party objecting must
first make a prima facie showing that the other party has used a
peremptory challenge for racial reasons. 
Ladd v. State, 3 S.W.3d 547, 563 (Tex. Crim. App.
1999)(citing  Purkett v. Elem, 514
U.S. 765, 770 (1995)).  Once a prima
facie showing of purposeful discrimination has been made, the burden of
production shifts to the other party to provide a race-neutral explanation.  Id.  An explanation is deemed race-neutral so long
as no discriminatory intent is inherent in the explanation given, even if the
explanation is fantastic or implausible.  Williams v. State, 937 S.W.2d 479, 485
(Tex. Crim. App. 1996) (citing Purkett, 514 U.S. at 770).  If a race-neutral explanation is tendered,
the opponent of the strike must show that the race-neutral reason is a pretext
for discrimination.  Id.  The trial court must then decide whether the
objecting party has proven purposeful discrimination.  Id.  


Since
the trial court's decision will turn largely on an evaluation of credibility,
the appellate court must give that decision great deference and must not
disturb it unless it is clearly erroneous.  Ladd, 3 S.W.3d at 563.  To determine whether the fact finder's decision is
"clearly erroneous," appellate courts look to the record to see if
they are left with the definite and firm conviction that a mistake has been
committed.  Hill v. State, 827 S.W.2d 860, 865 (Tex. Crim. App. 1992).  In doing so, the evidence must be
considered in the light most favorable to the trial court's rulings.  Id. 








In the
instant case, appellant specifically complains of the State=s strikes
against two veniremembers of African-American descent, numbers eight and
fifteen.  Appellant claims that there
were only three veniremembers of African-American descent and these two were
struck with peremptory challenges and so this action raised the inference that
the State used their challenges on the base of race alone.[9]  Appellant objected to the use of these
strikes under the authority of Batson. The State offered explanations
for the strikes and the trial court made a determination that no discrimination
occurred. 

On appeal,
the State does not contest the prima facie showing.  Moreover, once a party offers a race-neutral
explanation for a peremptory challenge and the trial court rules on the
ultimate issue of intentional discrimination, the preliminary issue of a prima
facie case is moot.  Hernandez v. New York, 500 U.S. 352, 359 (1991).

We
therefore turn to the question of whether facially race-neutral reasons were
provided by the State as to the two challenged veniremembers of which appellant
complains.  At a hearing on the
challenged strikes, the State offered the following explanations for the
respective jurors through the testimony of the lead prosecutor who stated, 

Your
Honor, I did not use the strikes as a race, basis of race.  No. 8 was struck because I didn=t like the
way he answered my questions with regard to one-witness testimony.  No. 15 was struck because she has been a
professional juror.  In fact, she=s served
two times on drug cases in the past three years.  That=s the
reason I struck her. 








 

Reviewing
the record before us, we cannot find that the trial court erred in finding that
the proffered explanations were facially race-neutral.  At this second stage, the explanations may be
Asilly or
superstitious@ and need
not be either persuasive or even plausible, so long as they are facially
race-neutral.  Purkett, 514 U.S.
at 768.  Reluctance to rely on the
evidence of a single witness and recent prior jury service are  facially race-neutral explanations.  We do not find the trial court=s decision
in determining the explanations to be facially race-neutral to be Aclearly
erroneous.@  








Having
determined that facially race-neutral reasons were provided by the State, we
must next examine whether appellant met his burden to prove that the State=s
explanations were a mere pretext for discrimination.  Once a facially race-neutral explanation has
been advanced, it falls to the opponent of the strike to
prove that the neutral reason was merely a pretext for discrimination.  Williams, 937 S.W.2d at 485.  The opponent of the peremptory strike
has the burden to prove discrimination to the trial court by a preponderance of
the evidence; the State is not required to prove that it did not
discriminate.  Guzman v. State,
No. 1101-00, 2002 Tex. Crim. App. LEXIS 107, at *30 (Tex. Crim. App., May 22,
2002).  The record in the present case
does not reflect any offer of evidence to the trial court by appellant or even
any argument by appellant that countered the facially race-neutral explanations
offered by the State.  Appellant=s counsel
did perform a limited cross-examination of the prosecutor, asking the
prosecutor whether race was used Aas any
portion of your basis for striking@ each of
the jurors, to which questions the prosecutor answered Ano.@  The prosecutor also denied consulting with
another prosecutor about the strikes. 
Defense counsel then questioned the other prosecutor at the trial who
confirmed that he had stepped outside and did not participate in the
decision  regarding which jurors were to
be struck.  No other questions were asked
of the prosecutors and no evidence was offered by appellant.  Defense counsel made no further argument,
offering only that he renewed his objection to the strikes.








Since the
burden of persuasion is on the opponent of the strike, Afailure to
offer any real rebuttal@ to the
State=s facially
neutral explanation Acan be
fatal to his claim.A Johnson
v. State, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002); see Ford v. State,
1 S.W.3d 691, 694-94 (Tex. Crim. App. 1999)(where appellant never
cross-examined prosecutor about explanation and offered no evidence rebutting
the claim, he failed to prove that the reason given was a pretext for
discrimination).  In reviewing the record
in the instant case, we do not find that appellant carried his burden to prove
that the proffered explanations were mere shams or pretexts for discrimination.  Johnson, 68 S.W.3d at 649.  Additionally, there is some support in
the record for the State=s
explanations and the trial court=s
decisions.[10]   We find no clear error in the
trial court=s decision to overrule appellant=s Batson challenges as to these two strikes.  Appellant=s first issue is overruled. 


Confrontation Clause Violation

In his
second issue, appellant argues that his right to confrontation of witnesses
under the Sixth Amendment to the Constitution was violated when the trial court
permitted an officer to testify to inadmissible hearsay statements by witnesses
that were not identified or produced at trial. 
Review of the record of the portion of trial in question indicates that
no objection was made on this ground at trial.  
Rather, the only objection made was that the evidence being offered was
hearsay.  Hearsay objections and
objections to violations of the Confrontation Clause Aare
neither synonymous nor necessarily coextensive.@  Holland v. State, 802 S.W.2d
696, 700 (Tex. Crim. App. 1991).  A
hearsay objection does not preserve error predicated on a claim that one=s
constitutional confrontation rights are being violated.  Id.; Thacker v. State, 999 S.W.2d 56,
61 (Tex. App.BHouston
[14th Dist. 1999], pet. ref=d); Cofield
v. Sate, 857 S.W.2d 798, 804 (Tex. App.BCorpus
Christi 1993), aff=d, 891
S.W.2d 952 (Tex. Crim. App. 1994).   We
overrule appellant=s second
issue.    

Intent to Commit Theft

In his
final issue, appellant challenges the factual sufficiency of the evidence to demonstrate
that he intended to commit theft. 
Appellant renews the arguments that he made at trial that he had
intended to take the items to the courtesy desk when he was frightened by the
men who he felt came after him.








In
conducting a factual sufficiency review, we consider all the evidence offered
at trial without the prism of the light most favorable to the jury
verdict.  Clewis v. State, 922
S.W.2d 126, 134 (Tex. Crim. App. 1996). 
While authorized to disagree with the jury, the reviewing court must be
appropriately deferential to the jury=s findings
so as not to substitute its judgment for that of the fact-finder and so should
act only to prevent a manifestly unjust result.  Jones v. State, 944 S.W.2d 642, 648 (Tex.
Crim. App. 1996).  Unless the available
record clearly reveals a different result is warranted, a reviewing court must
defer to the jury=s
determination concerning the weight to be given contradictory testimonial
evidence.  Johnson v. State, 23
S.W.3d 1, 18 (Tex. Crim. App. 2000). 
Under a factual sufficiency review, the appellate court, after viewing
all the evidence neutrally,  is to consider
whether either the proof of guilt is so weak as to render it clearly wrong and
manifestly unjust or the verdict of guilt is against the great weight and
preponderance of the available  evidence.  Id. at 11.

Appellant
argues that he gave a Aplausible
explanation@ and that
his actions  were Aas
consistent with innocent behavior as with criminal activity,@ namely
that Aappellant
intended to take the items to the courtesy desk, became fearful when several
men started to approach him and ran back into the store.@  He asks us to consider his explanation as an Aalternative
reasonable hypothesis,@ urging
that Clewis permits such consideration. 









The former
Areasonable
hypothesis analytical construct@ used to
apply in a case of circumstantial evidence and required the State to exclude
all reasonable hypotheses, other than the defendant=s guilt,
in order for the evidence to be found legally sufficient on appeal.  Carleson v. State, 654 S.W.2d 444, 447
(Tex. Crim. App. 1983), overruled, Geesa v. State,  820 S.W.2d 154, 161(Tex. Crim. App.
1991).  The reasonable hypothesis
analytical construct  was overturned in Geesa
v. State, and no longer binds this Court.  Geesa v. State,  820 S.W.2d 154, 161(Tex. Crim. App.
1991).  While we may, and indeed must,
consider evidence offered by the defense in a factual sufficiency review, Clewis
did not reinstate the Areasonable
hypothesis@
analytical construct overruled by Geesa and does not even mention the
term Areasonable
hypothesis.@  The question before us is not whether
appellant presented an Aalternate
reasonable hypothesis@ or
whether he gave a Aplausible
explanation.@  Rather, we must determine, after viewing all
of the evidence submitted, whether the proof of guilt was so weak as to render
it clearly wrong and manifestly unjust or whether the verdict of guilt is
against the great weight and preponderance of the available evidence.  Johnson, 23 S.W.3d at 11. 

Having
considered all of the evidence under the standard enunciated in Johnson,
we find that the evidence is factually sufficient to support the conviction.   We overrule appellant=s third
issue.

Conclusion

Having
overruled all of appellant=s issues,
we affirm the conviction and sentence of the trial court.           

ERRLINDA
CASTILLO

Justice

Do not publish.

Tex. R. App. P. 47.3(b).

Opinion
delivered and filed

this 18th
day of July, 2002.











[1]
Tex. Pen. Code Ann. ' 29.03(a)(2)(Vernon
1994).





[2]
Tex. Pen. Code Ann. '' 31.03(a),(b)(1) & (e)(2)(A)(i)(Vernon Supp. 2002).





[3] Appellant
was in jail at the time of the trial and was released after the sentence was
pronounced as the time already served on this cause pending trial provided
sufficient credit to complete his assessed sentence. 





[4]
Batson v. Kentucky, 476 U.S. 79 (1986).





[5]
Ramirez later testified that the combined value of the items that were taken
was $221.01.





[6]
At the time of trial, Barnes was working as a correctional officer in Beeville,
Texas.  On November 18, 1999, Barnes was
working for a private transport company, transporting federal and state
inmates, having left a previous job as a correctional officer.





[7]
He testified he was particularly concerned about the walkie-talkies because
there had only been two on the shelves of the store.





[8]
He also admitted to having been convicted of unlawfully carrying a weapon.





[9]
Aside from defense counsel=s
claim to the trial court that the State struck two of the three
African-American veniremembers, there is no evidence in the record as to the
racial makeup of the venire panel and no evidence as to the racial makeup of
the jury selected.  We do not know, for
example, whether the third African-American was struck for cause, struck by
appellant, not reached, or perhaps even served on the jury.





[10]
The record of the voir dire reflects that veniremember number eight did
repeatedly state that he could not convict on just the testimony of one
witness, although he later stated it would depend on how the evidence was
presented and averred that he would listen to all the evidence and could
convict if the evidence supported a conviction. 
The record also reflects that veniremember number fifteen stated that
she had served on two criminal juries, both in drug cases, Athree
or four years ago.@