Opinion issued June 12, 2003


 












In The

Court of Appeals

For The

First District of Texas






NO. 01-02-00260-CR






KARENE MORTON THOMAS, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 180th District Court

Harris County, Texas

Trial Court Cause No. 860452









O P I N I O N

 Karene Morton Thomas, appellant, was charged with burglary of a habitation
with intent to commit sexual assault, a first degree felony (1) punishable by
imprisonment for life or for no more than 99 years and no less than five years and a
fine of no more than $10,000. (2) The jury found appellant guilty, and the trial court
assessed punishment at 30 years' confinement. We affirm. Facts

 The Charged Offense

 Nelle Patton is a 71-year-old woman who lives alone and enjoys playing tennis
three to five times a week. She had been harassed by constant doorbell rings and
knocks at her door with no one there when she answered. She had assumed that it
was teenagers. 

 On December 4, 1999, an intruder rang Patton's doorbell "insistently" until
she left her bedroom to answer the door. As she was walking down the hallway near
the living room in her home, she ran into appellant. Patton described appellant as
being a black man with little or no hair and gold rimmed glasses.

 Patton asked who appellant was, how he had gotten into the home, and what
he wanted. Appellant replied that he wanted "a little p****." Patton tried to distract
appellant from achieving his ultimate goal by laughing at his comment, asking him
questions, and trying to make small talk. Patton backed herself against the wall in the
hallway in order to protect herself. She realized that appellant had one of her knives
and was covering it with a white cloth. After she told him that the knife frightened
her, he dropped it.

 Appellant began to grope Patton, including her breasts. Appellant penetrated
Patton's vagina with his fingers and said he would not hurt her. She told him that he
was hurting her and he eventually stopped. Appellant got down on his knees and was
going to attempt oral sex, when Patton laughed and told him that her legs were too
long for him to do that. Appellant than grabbed Patton's hand and made her hold his
penis.

 Appellant began to realize that dawn was approaching. He walked into her
bedroom and asked Patton if she wanted him to leave. She told him that she did. 
Appellant said that he would leave through the front door if she would go into her
bedroom and lock the door. Patton, in fear of being raped and killed if she did that,
refused and said that she would go into the bedroom if he would go into the living
room. Appellant went to the living room and Patton ran to her bedroom and dead-bolted the door. She tried to call the police, but she could not because the telephone
lines had been cut. She grabbed her gun from the dresser and tried to shoot it. The
gun fired and went through her television, lodging the bullet in her dresser. She heard
appellant move and thought that he had left, so she went to her bathroom and tried to
climb out the window. She could not fit, and in attempting to get out, she laid the gun
on the window sill and it fired again, hitting the neighbor's garage. Patton then ran
to another bedroom and escaped through a window. She yelled for her neighbor, who
called 911.

 Officer Edward Srebalus arrived at Patton's home. He observed a broken
window pane in the breakfast area near the back door. He attempted to recover
fingerprints at the points of entry and exit, but was unsuccessful. A few weeks after
the attack, Patton sat down with a sketch artist and produced a sketch of the intruder
that closely resembled appellant.

 The Extraneous Offense at the Guilt/Innocense Phase

 Georgia Garrett is a 70-year-old woman who lives alone in an apartment. In
the beginning of 2000, Garrett saw the shadow of someone stooping outside her patio
window. The person ran away, and she called the police. About one month later,
Garrett saw a shadow again, and she again called the police. Garrett stated that both
times the individual was appellant. Garrett asked the apartment complex to install a
patio light, but someone kept jumping over the fence enclosing her patio and
unscrewing the light bulb and also shining a flashlight into her bedroom window. On
another occasion, someone left pornographic pictures titled "Promiscuous Granny"
at Garrett's apartment door.

 On November 6, 2000, officers were called to Garrett's apartment complex to
investigate an unrelated disturbance. They had been called to the complex numerous
times because of reports of a "peeping tom." While the officers were at the apartment
complex, Garrett called the police because someone was in her patio. A dispatcher
told the officers that a black man had been seen in one of the apartment's patios. 
Officer Steven May approached Garrett's apartment and saw a man standing near the
window in the patio. The other officer went into Garrett's apartment and walked
through the sliding glass door onto the patio to handcuff appellant. Appellant had a
flashlight and a tool that could be used to open a sliding glass door. 

 Appellant was arrested for this offense. While in custody he consented to
being placed in a line-up. Patton was unable to make a positive identification. 

 The Confession

 Appellant made an oral confession that was audio-taped on November 6, 2000,
and was played to the jury over a renewed objection. Appellant does not contest the
admissibility of the confession on appeal. In the confession, appellant admits to his
interest in older women and to looking into other people's homes because he was
attracted to the light coming from the windows. He states that he was face-to-face
with only one woman around a year before the confession, i.e., around the time of the
offense with which he was charged. Appellant admits that he entered the woman's
home through a door, either the garage or the kitchen door, which he claims was
open, but that he was not let into the woman's home by the woman; that he then rang
her door bell; that when she answered the bell, he fondled her breasts and rubbed her
legs near or in her living room where she was standing; and that her legs interested
him the most. The woman told him what he was doing was wrong, told him that he
looked like a nice person that would not do something like this, asked him why he
was doing what he was doing, and said to him, "God bless [you]." He left after the
woman asked him to leave; and the woman told him she would pray for him. 
Appellant identified the woman as someone who plays tennis and described her as
Caucasian, in her fifties or sixties.

 Appellant stated that the night he was in Garrett's patio, he left his apartment
around 1:30 a.m. Appellant also explained why he was in Garrett's patio on
November 6, 2000. He stated that he saw a couple of flower pots that interested him
and wanted to get a closer look. He explained that he could see the flower pots from
the walkway. In order to get a better look at the flowerpots, he "crossed over" the
fence surrounding the patio. Appellant had no intention of taking the flower pots, and
he had no idea that anyone was in the apartment.

 A motion to suppress the confession was filed during pretrial and a hearing was
held on that motion. The purpose of the hearing was to determine if the confession
was given voluntarily. The trial court ruled that the confession was given voluntarily
and found it admissible. During trial, Patton was unable to make a positive
identification of appellant, testifying, "the man sitting over here looks somewhat like
him, but I can't swear to it." She likewise was unable to make a positive
identification of appellant's voice from the recorded confession, testifying only that
appellant's voice was "similar" to her assailant's.

Issues

 In five points of error, appellant argues that (1) the trial court abused its
discretion by allowing the State to offer evidence of extraneous offenses to prove
appellant's identity as the offender; (2) the evidence was legally insufficient to
support his conviction; (3) the evidence was factually insufficient to support his
conviction; (4) he was denied effective assistance of counsel because his counsel did
not obtain pretrial rulings or object to the admissibility of the State's evidence; and
(5) he was denied effective assistance of counsel because of the cumulative effect of
the errors of counsel.

Discussion

 Extraneous Offense

 In his first point of error, appellant argues that the trial court abused its
discretion by improperly allowing the State to offer extraneous conduct pursuant to
Texas Rule of Evidence 404(b) to prove his identity as the offender. Specifically,
appellant contends that no requisite connective similarities between the charged
offense and the extraneous offense exist and that they are too remote in time to be
admissible. (3)

 We review the decision to admit evidence of other crimes, wrongs, or acts
under an abuse of discretion standard of appellate review. See Roberts v. State, 29
S.W.3d 596, 600 (Tex. App.--Houston [1st Dist.] 2000, pet. ref'd). As long as the
trial court's ruling was within the "zone of reasonable disagreement," there is no
abuse of discretion, and we must uphold the ruling. Id. 

 As a general rule, to prevent an accused from being prosecuted for some
collateral crime or misconduct, the State may not introduce evidence of bad acts
similar to the offense charged. Id. at 600-01. However, as an exception to the
general rule of exclusion, evidence of "other crimes, wrongs, or acts" may be
admissible if it has relevance to a material issue other than to show that the accused
acted in conformity with some trait of character and the probative value of the
evidence is not "substantially outweighed by the danger of unfair prejudice." Id. at
601. Evidence of other crimes, wrongs, or acts is relevant apart from showing
character conformity if the proponent shows that it "tends to establish some elemental
fact, such as identity or intent." Id.

 Identity may be placed at issue or in dispute through the cross-examination of
the identifying witness. Page v. State, 88 S.W.3d 755, 763 (Tex. App.--Corpus
Christi 2002, pet. ref'd). This occurs only when the identifying witness has been
impeached about (1) a material detail of the identification; (2) the conditions
surrounding the charged offense and the witness's identification of the defendant in
that situation; or (3) an earlier misidentification of the defendant. Id. 

 In this case, Patton could not visually identify appellant as the intruder. 
Identity was placed at issue by appellant through his cross-examination of Patton
regarding whether she could identify him because of the lighting in her home,
whether she saw him long enough to identify him, and whether she was wearing her
glasses.

 To be admissible to show identity, an extraneous offense must be so similar to
the offense charged that the offenses are marked as the accused's handiwork. Lane
v. State, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996). In other words, to be relevant,
the evidence must bear the "signature" of the offender. Linder v. State, 828 S.W.2d
290, 297 (Tex. App.--Houston [1st Dist.] 1992, pet. ref'd). If there are sufficient
common distinguishing characteristics between the extraneous offense and the
charged offense such that the probative value of the evidence outweighs its
prejudicial effect, the court may admit the evidence. Id. The factors of remoteness
and similarity of an extraneous offense are important, not in and of themselves, but
only as they bear on the relevancy and probative value of the offered evidence of
extraneous offenses. Id. Therefore, remoteness or dissimilarity do not per se render
an extraneous offense irrelevant. See id. The extraneous offense and the charged
offense can, therefore, be different offenses, so long as the similarities between the
two offenses are such that the evidence is relevant. Id.

 To determine the similarity between the offenses for the purpose of establishing
identity, appellate courts should take into account both the specific characteristics of
the offenses and the time interval between them. Johnson v. State, 68 S.W.3d 644,
651 (Tex. Crim. App. 2002) (citing Lane, 933 S.W.2d at 519). Sufficient similarity
may be shown by proximity in time and place or by a common mode of committing
the offenses. Lane, 933 S.W.2d at 519 (citing Ransom v. State, 503 S.W.2d 810, 813
(Tex. Crim. App. 1974)).

 In Walker v. State, the Texas Court of Criminal Appeals held that offenses were
sufficiently similar because (1) they occurred (a) at night, (b) in the same area, (c)
within a period of one month; (2) the defendant (a) was alone and (b) carried a small
gun; (3) the victims were tied in a similar manner; (4) the robbery preceded the rape;
and (5) all coins but pennies were taken from the victims. 588 S.W.2d 920, 924 (Tex.
Crim. App. 1979). In Ransom, the Court of Criminal Appeals held that offenses were
sufficiently similar because (1) the offenses were three days apart and both offenses
were (2) robberies (3) committed at gunpoint (4) by the defendant and an accomplice. 
503 S.W.2d at 813.

 More recently, in Lane, the Court of Criminal Appeals held that, although the
time and place of the offenses were not in close proximity, were a decade apart and
took place in different states, the mode of committing the offense and the
circumstances surrounding them were sufficiently similar for the extraneous offense
to be relevant to the issue of identity. 933 S.W.2d at 519. In Johnson, the Court of
Appeals held that offenses committed within a few hours of each other, directed at
lone women, and involving another victim's red Ford Taurus were sufficiently
similar. (4) 68 S.W.3d at 650-52. 

 In the instant case, Garrett and Patton were both women in their late sixties or
early seventies; they lived alone a half-mile apart. Both had been harassed for some
time over approximately the same period, always at night; the assault on Patton
occurred in December, 1999; the harassment of Garrett began a year before that, and
appellant was arrested outside Garrett's apartment 11 months after the assault on
Patton. During this time there were many reports of a peeping tom at the complex
where Garrett lived. The intruder entered Patton's house by breaking a back window
and then armed himself with a knife from her kitchen; appellant was apprehended on
Garrett's patio with a long, bent wire for gaining entry into a patio door and a
flashlight. The intruder sexually assaulted Patton; someone left pornographic pictures
of elderly women outside Garrett's door the night before appellant was arrested on
her patio with a tool for gaining entry. Patton described her assailant as a tall black
man wearing gold-rimmed glasses; appellant is a tall black man who was wearing
gold-rimmed glasses when arrested. Patton produced a sketch that closely resembled
appellant.

 We must uphold the trial court's decision to admit evidence of other crimes,
wrongs, or acts so long as the court's ruling was within the "zone of reasonable
disagreement." Roberts, 29 S.W.3d at 600. We find that there were sufficient
common distinguishing characteristics between the extraneous offense and the
charged offense of burglary of a habitation with the intent to commit sexual assault. 
Furthermore, we find that the time period between the charged offense and the
extraneous offense, 11 months, is not so remote in time to be inadmissible under the
circumstances of this case. Accordingly, the trial court did not abuse its discretion
in admitting the extraneous offense evidence. 

 We overrule appellant's first point of error.

 Legal and Factual Sufficiency

 In his second and third points of error, appellant argues that the evidence was
legally and factually insufficient to support his conviction. 

 In reviewing legal sufficiency, we view the evidence in a light most favorable
to the verdict and ask whether any rational trier-of-fact could find the essential
elements of the crime beyond a reasonable doubt. King v. State, 29 S.W.3d 556, 562
(Tex. Crim. App. 2000); Valencia v. State, 51 S.W.3d 418, 423 (Tex. App.--Houston
[1st Dist.] 2001, pet. ref'd). The fact finder may reasonably infer facts from the
evidence before it, credit the witnesses if it cares to, disbelieve any or all of the
testimony proffered, and weigh the evidence in the manner it chooses. Bruno v. State,
922 S.W.2d 292, 293 (Tex. App.--Amarillo 1996, no pet.). 

 In reviewing factual sufficiency, we examine all the evidence neutrally and ask
whether proof of guilt is so obviously weak as to undermine confidence in the jury's
determination or so greatly outweighed by contrary proof as to indicate that a
manifest injustice has occurred. Zuliani v. State, 97 S.W.3d 589, 594 (Tex. Crim.
App. 2003); King, 29 S.W.3d at 563; Valencia, 51 S.W.3d at 423. While conducting
our analysis, if there is probative evidence supporting the verdict, we must avoid
substituting our judgment for that of the trier-of-fact, even when we disagree with the
determination. King, 29 S.W.3d at 563. The trier-of-fact is the sole judge of the
weight and credibility of the witness testimony. Johnson v. State, 23 S.W.3d 1, 7
(Tex. Crim. App. 2000).

 A person commits burglary if, without the effective consent of the owner, the
person enters a habitation and commits or attempts to commit a felony, theft, or an
assault. Tex. Pen. Code Ann. § 30.02(a)(3) (Vernon 2003). To sustain a conviction
for burglary of a habitation with the intent to commit sexual assault, a first degree
felony, it must be shown that appellant entered the habitation with the intent to
commit sexual assault. Id. § 30.02(d).

 Evidence other than the extraneous offense evidence discussed above was
offered at trial. Patton testified that, on the night in question, the doorbell rang
"insistently" around 4:00 a.m.; she ran down the hallway from her bedroom by the
living room and ran into an intruder; she asked the intruder what he was doing in her
home, what his name was, and what he wanted; she pinned herself up against the wall
near the living room; the intruder groped her body, including her breasts; the intruder
talked about her legs, saying they were very strong legs; she told the intruder that she
played tennis; and the intruder had a nice soft-spoken voice. Patton testified that she
did not know that the window in her breakfast room had been broken because the
intruder had told her that her door was unlocked.

 Patton described the intruder as a black male in his early thirties with little to
no hair and gold-rimmed glasses. A sketch of the intruder that was drawn a few
weeks after the incident was introduced into evidence. Also, Patton identified
appellant as the intruder, although with the caveat that she could not "swear to it,"
and identified appellant's voice on the audio-taped confession as similar to the
intruder. 

 In his confession, which was played to the jury, appellant admitted to his
interest in older women and admitted to looking into other people's homes because
he was attracted to the light coming from the windows. Appellant stated that he was
face-to-face with only one woman around a year before the confession; identified the
woman that he hurt as someone who plays tennis; admitted that he was in the
woman's home; admitted that he rang her door bell; and admitted that he was not let
into the woman's home by the woman, but that he entered through a door, either the
garage or the kitchen door, which he claimed was open. He described the woman as
Caucasian and in her fifties or sixties. He admitted that he fondled the woman's
breasts and rubbed her legs near or in her living room where the woman was standing;
and he admitted that her legs interested him the most. He stated that the woman told
him what he was doing was wrong; the woman told him he looked like a nice person
that would not do something like this; the woman asked why he was doing what he
was doing; and the woman said to appellant, "God bless [you]." He stated that he left
after the woman asked him to leave and that the woman told him she would pray for
him.

 Appellant testified at trial that he had never seen Patton until trial. Appellant
denied burglarizing Patton's home. 

 Viewing the evidence in the light most favorable to the verdict, we hold that
the evidence was legally sufficient for a rational trier-of-fact to find the essential
elements of the crime beyond a reasonable doubt. Viewing the evidence neutrally,
we observe that the jury decided, in this case, to believe Patton and appellant's tape
recorded confession and to disbelieve appellant's testimony. Because the jury, as
trier-of-fact, is the sole judge of the weight and credibility of the witness testimony,
and because the proof of guilt was not so obviously weak as to undermine confidence
in the jury's determination, or so greatly outweighed by contrary proof as to indicate
that a manifest injustice occurred, we hold that the evidence was factually sufficient 
to support the verdict. 

 We overrule appellant's second and third points of error.

 Ineffective Assistance of Counsel

 In his fourth and fifth points of error, appellant argues that, when looking at the
totality of the representation, he was denied effective assistance of counsel during the
guilt/innocense phase of the trial because trial counsel did not seek and obtain pretrial
rulings or object to the admissibility of the State's evidence; and he was denied
effective assistance of counsel because of the cumulative effect of those errors. We
address both points of error together.

 To determine if a defendant has been denied effective assistance of counsel, we
follow the standard set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.
Ct. 2052, 2064 (1984). First, appellant must demonstrate that counsel's
representation fell below an objective standard of reasonableness under prevailing
professional norms. Howland v. State, 966 S.W.2d 98, 104 (Tex. App.--Houston [1st
Dist.] 1998), aff'd, 990 S.W.2d 274 (Tex. Crim. App. 1999). Second, appellant must
establish that counsel's performance was so prejudicial that it deprived him of a fair
trial. Id. Thus, appellant must show that a reasonable probability exists that, but for
counsel's unprofessional errors, the result of the proceeding would have been
different. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; Howland, 966 S.W.2d at
104. Appellant has the burden to establish both of these prongs by a preponderance
of the evidence. Jackson v. State, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998);
Davis v. State, 830 S.W.2d 762, 765 (Tex. App.--Houston [1st Dist.] 1992, pet.
ref'd). We cannot speculate beyond the record provided. Jackson v. State, 877
S.W.2d 768, 771 (Tex. Crim. App. 1994); Gamble v. State, 916 S.W.2d 92, 93 (Tex.
App.--Houston [1st Dist.] 1996, no pet.). Appellant must overcome the presumption
that trial counsel's strategy was sound. Gamble, 916 S.W.2d at 93.

 An appellant "making a claim of ineffective assistance must identify the acts
or omissions of counsel that are alleged not to have been the result of reasonable
professional judgment." Strickland, 466 U.S. at 690. Any allegation of
ineffectiveness must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness. Thompson v. State, 9 S.W.3d
808, 813 (Tex. Crim. App. 1999). Although there was a motion for new trial and a
hearing on that motion, the record from that hearing is silent as to what appellant's
trial counsels' strategy was during trial. To find that trial counsel was ineffective
based on any of the asserted grounds would call for speculation, which we will not
do. Gamble, 916 S.W.2d at 93. Moreover, appellant has made no showing that, but
for his counsel's unprofessional errors, the result of the proceeding would have been
different.

 We overrule appellant's fourth and fifth points of error.Conclusion

 We affirm the judgment of the trial court.

 


 Evelyn V. Keyes

 Justice


Panel consists of Justices Taft, Keyes, and Higley.

Justice Higley, concurring.

Publish. Tex. R. App. P. 47.4.
1. See Tex. Pen. Code Ann. § 30.02(d) (Vernon 2003); id. § 22.011(f). 
2. See id. § 12.32.
3. Appellant also complains that other evidence improper under Rule 404(b) was
offered against him to prove identity. Specifically, he complains that Patton's
testimony that someone had been ringing her doorbell late at night for more than a
year, May's testimony that he had been dispatched to Garrett's apartment many times
for peeping tom cases and that other peeping tom incidents had occurred, and
Garrett's testimony that someone had been looking in her window and leaving
pornographic material on her doorstep were improperly offered as extraneous offense
evidence by the State. He also complains that the State did not provide notice that
this evidence was going to be offered at trial.

 Appellant's trial counsel objected to the admissibility of the extraneous offense
committed against Garrett under Rules 403 and 404(b), but failed to object to any
other extraneous offense evidence or to lack of notice that the evidence would be
offered. Therefore, appellant has failed to preserve error with regard to lack of notice
or to any extraneous offenses, other than the criminal trespass against Garrett, 
addressed above, and these issues are waived. See Tex. R. App. P. 33.1(a). We note,
however, that the State did provide notice to appellant that evidence of extraneous
offenses that occurred from January, 2000 through June, 2000, would be offered at
trial. Specifically, the State notified appellant that "[t]hroughout the year 2000 there
were several trespass reports regarding Ms. Garrett, Ms. [Kelley] Cooksey and the
apartment complex in which they lived. The defendant is a suspect in each case."
4. See also Pena v. State, 867 S.W.2d 97, 99 (Tex. App.--Corpus Christi 1993,
pet. ref'd) (addressing similarities between the charged offense and extraneous
offense involving elderly individuals); Contreras v. State, 838 S.W.2d 594, 599-600
(Tex. App.--Corpus Christi 1992, pet. ref'd) (listing similarities between charged
offense and extraneous offense involving elderly individuals, although not directly
addressing whether offenses had sufficient similarities); but see Reyes v. State, 69
S.W.3d 725, 738-41 (Tex. App.--Corpus Christi 2002, pet. ref'd) (finding that
similarities between two offenses were common to crime itself, namely burglary of
habitation with intent to commit and committing sexual assault, rather than
similarities peculiar to offenses; similarities were that intruder, not wearing glasses,
entered two residences in same vicinity, in early morning hours, fondled victims
while they slept with child, and fled when they awoke; dissimilarities between
offenses included that victims were not of same race; intruder was fully clothed in
one, but wearing nothing but boxer shorts in other; on earlier occasion intruder
fondled both breasts and vaginal area of person, while on latter intruder fondled only
vaginal area, which resulted in penetration with his fingers; bedroom in extraneous
offense was not lit, but bedroom of victim in charged offense was well lit by exterior
light; several people were home in first offense, but only victim and her son were
home in charged offense; and entry in extraneous offense was gained by using chair
and climbing through window, but in charged offense it was through unlocked
garage); Avila v. State, 18 S.W.3d 736, 740-42 (Tex. App.--San Antonio 2000, no
pet.) (determining that similarities between two offenses were not substantial enough
to warrant admissibility of extraneous offense; similarities were that both offenses
occurred within city limits of Crystal City in darkness and at night, to victims who
were asleep and who did not give consent to intruder to enter rooms; in both offenses
victims were turned over and sexual act was in essentially same position; court held
that similarities between the two offenses were those common to crime itself and not
"similarities peculiar to both offenses").