**Derrick Lamone JOHNSON, Appellant,**

**v.**

**The STATE of Texas.**

**No. 73765.**

Court of Criminal Appeals of Texas.

Jan. 30, 2002.

---

Douglas H. Parks, Dallas, for appellant.

Anne B. Wetherholt, Assist. DA, Dallas, Matthew Paul, State's Attorney, Austin, for state.

## OPINION

KELLER, P.J., delivered the opinion of the Court in which MEYERS, WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

Appellant was convicted in November 1999 of capital murder.[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure, Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death.[2] Direct appeal to this Court is automatic.[3] Appellant raises twenty-three points of error. We will affirm.

### A. Facts

On January 21, 1999, LaTausha Curry, age 25, lived with her parents in the Oak Cliff area of Dallas. She owned a red, 1987 Ford Taurus. That evening she set out for Camp Wisdom road to meet someone for a date. She never returned. In a written confession, appellant admitted that he and an accomplice sexually assaulted and killed Curry, and in an oral statement given before the body had been discovered, he told the police where Curry's body could be found. The body was found where appellant said it would be. Appellant's fingerprints were found in the victim's car, and DNA testing matched appellant to seminal fluid found on Curry's sweat pants.

---

1. Texas Penal Code § 19.03(a)(2): "A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and ... the person intentionally commits the murder in the course of committing or attempting to commit kidnapping ... robbery ... [or] aggravated sexual assault."

2. Article 37.071, § 2(g). Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

3. Article 37.071 § 2(h).

At around midnight on the evening Curry disappeared, Stella Wilson went to a gas station. At the station, she noticed what she described as a "burgundy" car occupied by two young black men. One of these men later pointed a gun at her and demanded her purse, which she relinquished. In court, she identified appellant as the robber and driver of the car. She also identified Curry's red Ford Taurus as the car he was driving.

About 1:30 to 2:00 a.m. on January 22nd, Tanya Robinson, an assistant manager at a Jack in the Box, was driving home from work. She noticed behind her a reddish car occupied by two people. The red car began to chase her and hit her car while both vehicles were going about seventy-five miles per hour. She stopped her car, and when the driver of the red car got out of the car, she put the car in reverse and tried to run over him. Robinson then drove back to the Jack–in–the–Box and asked an employee to call the police. She then began to chase the red car to get a license plate number. The police subsequently joined the chase.

During the chase, Officer Larry Byers saw the red car crash and two black males run from the car. Byers identified appellant as the driver. Robinson caught up with the red car after the occupants had fled and therefore was not able to identify the driver at trial. She did, however, identify the victim's Ford Taurus as the car that had chased her. The victim's car was impounded and searched, resulting in the recovery of various items, including a pipe made to look like a gun, a mace dispenser, and a cell phone.

As a result of this incident appellant was charged with the capital murder of Curry under three different legal theories: murder in the course of kidnapping, murder in the course of robbery, and murder in the course of aggravated sexual assault. Two different theories of party liability were submitted to the jury: intent to promote the commission of the offense[4] and commission of the offense during a conspiracy.[5]

## B. Guilt

### 1. *Batson*

In point of error one, appellant contends that the trial court erred in failing to sustain his *Batson*[6] objection to the State's exercise of a peremptory challenge against prospective juror Vines. Vines is an African American. In response to appellant's objection, the State offered the following reasons for the strike:

1. Vines failed to disclose, on her jury questionnaire, a prior arrest for driving while her license was suspended.

2. Vines's answers to questions revealed a resentment towards police officers.

3. Vines had an undue tendency to answer the future dangerousness affirmatively, was biased against the minimum range of punishment for the lesser included offense of murder, and harbored a bias against the mitigation special issue.

Defense counsel offered no evidence to rebut the State's reasons.

 Appellant now claims that the State's reasons were insufficient. According to *Batson v. Kentucky*, the use of peremptory challenges to intentionally exclude persons from the jury because of race violates the Fourteenth Amendment

---

4. *See* Texas Penal Code § 7.02(a)(2).

5. *See* Texas Penal Code § 7.02(b).

6. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

of the United States Constitution.[7] There is a three-step process for advancing a *Batson* claim: (1) The objecting party must make a *prima facie* case of discrimination, (2) once a *prima facie* case is made, the striking party must tender race-neutral reasons for the strike, and (3) if race-neutral reasons are tendered, the objecting party must prove purposeful discrimination.[8] Appellate courts must give great deference to credibility and demeanor determinations made by the trial court in connection with a *Batson* inquiry.[9]

■ Because the State offered its reasons for the strike, the prima facie case inquiry is moot, and we move on to whether the reasons offered are in fact race-neutral.[10] Regarding the State's first reason—Vines's failure to reveal her prior arrest—appellant contends that the record contains no evidence to support this claim besides the prosecutor's "bare assertion." The record shows that a person of the same name and date of birth as this prospective juror was arrested in Dallas County for driving while her license was suspended. Appellant complains that the State failed to inquire further and ask this prospective juror whether she was in fact the person arrested.

■ As the party making the *Batson* challenge, appellant had the burden to show that the explanation given was merely a pretext for discrimination.[11] It is not enough merely to show that a proffered explanation turns out to be incorrect.[12] Moreover, a party's failure to offer any

real rebuttal to a proffered race neutral explanation can be fatal to his claim.[13] Here, appellant has failed to prove that the prosecutor's explanation was incorrect, much less that it was a pretext for discrimination.

■ Regarding the State's second reason—the prospective juror's resentment towards the police—appellant contends that the trial court overlooked other testimony given by Vines that was favorable to police officers. Vines made both positive and negative comments about police officers. She stated that she thought some officers took advantage of their uniforms and positions to harass innocent victims—including her twenty-one year old nephew—but she also stated that she was grateful to officers who put their lives on the line and her main complaint was that too much time was spent on traffic violations rather than enforcement against serious offenses. While Vines did give some positive feedback about police officers, the State was entitled to believe, based upon the negative feedback that she gave, that her presence on the jury would be adverse to the State's interests.

■ Finally, appellant contends that the State's third reason is a sham because it shows that Vines is a good State's juror on death penalty issues. However, the State is not limited to challenging only defense-oriented prospective jurors. In the area of challenges for cause, we have held that the State may exercise chal-

---

7. *Ladd v. State,* 3 S.W.3d 547, 563 (Tex.Crim. App.1999), *cert. denied* 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000); *Batson, supra.*

8. *Id.*

9. *Id.*

10. *Id.* at 563 n. 8.

11. *Ford v. State,* 1 S.W.3d 691, 693–694 (Tex. Crim.App.1999).

12. *Id.* at 694.

13. *See Chamberlain v. State,* 998 S.W.2d 230, 236 (Tex.Crim.App.1999), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000).

lenges against jurors who are biased in ways that are adverse to the defendant,[14] including jurors who cannot consider the minimum end of the punishment range for an offense.[15] This is so because the State's interest is not merely to convict, but to ensure that justice is done, which includes procuring fair and impartial jurors.[16] For this reason, the State's ability to challenge veniremen for cause is broader than and encompasses the defendant's ability to challenge a potential juror.[17] The same reasoning applies to peremptory challenges. In ensuring that justice is done, the State may legitimately strike prospective jurors who appear to be unfavorable to the defense in ways that call into question their impartiality. The trial court was entitled to believe that the State did not strike Vines on account of her race. Finding that the State has advanced race-neutral reasons for its peremptory challenge, and that appellant has failed to meet his burden of showing intentional discrimination, we overrule point of error one.

## 2. *Extraneous offenses*

In points of error seven through twelve, appellant claims that the trial court erred in admitting the extraneous offenses committed against Wilson and Robinson. He argues that the evidence was irrelevant under Texas Rule of Evidence 401,[18] constituted an inadmissible extraneous offense under Rule 404(b),[19] and was substantially more prejudicial than probative under Rule 403.[20] The State responds that the extraneous offenses were admissible as same transaction contextual evidence,[21] to establish identity, and to show conspiracy liability. We need not address the same transaction contextual evidence theory advanced by the State because we find the evidence to be relevant under Rule 404(b)(and Rule 401) for several other purposes.

First, the evidence was admissible to show identity. Ordinarily, to be admissible to show identity, an extraneous offense must be so similar to the charged

14. *Allridge v. State*, 850 S.W.2d 471, 486–487 (Tex.Crim.App.1991), *cert. denied*, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993).

15. *White v. State*, 779 S.W.2d 809, 823–824 (Tex.Crim.App.1989), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990); *Nethery v. State*, 692 S.W.2d 686, 691–692 (Tex.Crim.App.1985), *cert. denied*, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986).

16. *Nethery*, 692 S.W.2d at 691; *Caldwell v. State*, 818 S.W.2d 790, 795 (Tex.Crim.App. 1991), *cert. denied*, 503 U.S. 990, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992), *overruled on other grounds by, Castillo v. State*, 913 S.W.2d 529, 534 (Tex.Crim.App.1995).

17. *Bigby v. State*, 892 S.W.2d 864, 881 (Tex. Crim.App.1994), *cert. denied*, 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 860 (1995).

18. Rule 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence."

19. Rule 404(b) provides in relevant part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ."

20. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

21. *See Camacho v. State*, 864 S.W.2d 524, 527, 531–532 (Tex.Crim.App.1993), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994).

offense as to mark the offenses as the defendant's handiwork.[22] For such evidence to be admissible, identity must be an issue in the case.[23] In determining similarity of the offenses for the purpose of establishing identity, appellate courts should take into account both the specific characteristics of the various offenses and the time interval between them.[24]

■ Here, the time interval was very short. If the offenses were not "same transaction contextual offenses" they came very close to being such. The exactness that might be required of an offense committed at a more remote period of time might not necessarily be required for an offense committed within a very short period of time.[25] The offenses presented here were committed within a few hours of each other, directed at lone women, and involved the victim's red Ford Taurus. Wilson and Byers specifically identified appellant as the driver of the victim's car on the occasions in question. Even without other similarities, possession of the victim's car is a significant piece of evidence tying appellant to the victim's death. And identity was the only disputed issue in the case. Though appellant's challenges on the identity issue may not have been persuasive, that was nevertheless his only defense. He did not attempt to show consent, self-defense, duress, necessity, or any other defensive theory. Appellant challenged the voluntariness of his confession and attempted to minimize the eyewitness testimony and the physical evidence.

■ Second, the extraneous offenses were admissible to establish the theft element of robbery. To establish the "murder in the course of robbery" theory of capital murder, the State was required to show that the murder was committed during the course of the theft rather than the theft being a mere afterthought.[26] The offenses against Wilson and Robinson evidenced a scheme of robbing women who traveled alone.[27] Finally, the State is correct in asserting that the multiple offenses tended to establish a conspiracy between appellant and his accomplice.

■ Nor are we persuaded by appellant's contention that the evidence is unfairly prejudicial under Rule 403. The extraneous offenses were highly probative because they placed the primary offense in context of the scheme carried out that night[28] and because they tended to prove appellant's identity as the perpetrator. Appellant contends that the State did not need the extraneous offenses because it had so much other evidence identifying him as the perpetrator. It is true that the State's other evidence was strong. The State had DNA evidence, fingerprints, appellant's written confession admitting guilt, and an oral confession that led to the discovery of the body. But appellant challenged the probative value of much of this evidence. Despite the fact that the State

22. *Lane v. State,* 933 S.W.2d 504, 519 (Tex. Crim.App.1996).

23. *Id.*

24. *Id.*

25. *See Ransom v. State,* 503 S.W.2d 810, 813 (Tex.Crim.App.1974)("[T]he common distinguishing characteristic may be the proximity in time and place *or* the common mode of the commission of the offenses" (emphasis added)); *see also Lane,* 933 S.W.2d at 519.

26. *Dowthitt v. State,* 931 S.W.2d 244, 250 (Tex.Crim.App.1996).

27. *Lawton v. State,* 913 S.W.2d 542, 552 (Tex. Crim.App.1995), *cert. denied,* 519 U.S. 826, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996)(evidence of crime spree tended to show intent to commit theft for the primary offense).

28. *Id.* at 552–553.

had this other evidence, the extraneous offense evidence was not unfairly prejudicial. It was very probative and added a significant dimension to the evidence not otherwise before the jury—eyewitness testimony inferentially linking appellant to the crime. Points of error seven through twelve are overruled.

### 3. *Search and seizure*

In points of error thirteen through sixteen, appellant contends that the trial court erred in failing to suppress the fruits of a search of his home. On January 25, 1999, police officers came to appellant's apartment with a warrant for his arrest. According to Sergeant Conover, he and three other plainclothes detectives knocked on appellant's door. When appellant opened the door, Sergeant Conover said, "Derrick Johnson, you're under arrest." Appellant asked why, and Sergeant Conover replied that he had a warrant. Appellant then stated, "Yeah, you got me, man; you got me." Appellant testified that four or five officers arrested him with guns drawn. Sergeant Conover testified that he was the officer in front and did not have his gun drawn, but he did not know whether any of the other officers had drawn their guns. He agreed that his gun, though not drawn, was visible. Appellant was handcuffed and officers conducted a protective sweep of the residence to ensure that no victims or other perpetrators were inside the apartment. Nothing was found during the course of the protective sweep.

Sergeant Conover asked appellant whose apartment it was, and appellant replied that it was his. Sergeant Conover then asked appellant if the police could search his apartment. According to the sergeant, appellant said, "Sure, go ahead" and "Yeah, man, you can search. That's my room back there," and pointed to the location of his room. The sergeant testified that no threats were made, no *Miranda* warnings were given, and no consent to search form was signed. Sergeant Conover testified that he did not have a consent form at the time and did not believe it was practical to get one because the victim was still missing and he thought there was a good chance that she could be in the apartment. The sergeant conceded that appellant was not told he had the right to refuse consent. At the motion to suppress hearing, appellant testified that he never gave consent. As a result of the search, officers found a fake gun made from pipe, handwritten notes indicating bus routes, papers containing gangster rap lyrics, and a cell phone later linked to an extraneous robbery.[29]

Appellant claims that this evidence should have been suppressed because it was obtained in a search that violated the Fourth Amendment and Article I, § 9 of the Texas Constitution.[30] For search and seizure issues, we engage in a mixed review: We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor while we review

---

**29.** The first two items were introduced at guilt while the last two items were introduced only at punishment. Appellant has divided these two sets of items for the purpose of argument in his brief, but we will address them together since they arise from the same facts.

**30.** Appellant points out that the Texas Constitution requires that a consent to search be established by clear and convincing evidence as opposed to a mere preponderance required by the United States Constitution. Accordingly, we review the evidence under the more protective Texas standard. *See State v. Ibarra*, 953 S.W.2d 242, 244–245 (Tex.Crim.App. 1997).

*de novo* application-of-law-to-fact questions that do not turn upon credibility and demeanor.[31] In determining whether an accused's consent to search is voluntary, appellate courts must look to the totality of the circumstances.[32] Although a police officer's failure to inform the accused that he can refuse consent is a factor to consider, the absence of such information does not automatically render the accused's consent involuntary.[33] Nor is consent rendered involuntary merely because the accused is under arrest.[34]

■ Based upon the testimony, the trial court could have believed that the officers' guns were not drawn at the time of appellant's arrest. The trial court could also have believed that appellant actually consented to the search. Appellant gave contrary testimony but the trial court, as the fact-finder, was free to disbelieve appellant.[35] Given these presuppositions, we consider whether the consent was voluntary.

This Court addressed the voluntariness of a consent to search in *Reasor v. State.*[36] In that case, the police conducted an illegal protective sweep,[37] arrested the defendant with guns drawn, handcuffed the defendant before asking for his consent to search, and asked for a consent to search after they had taken the defendant inside the home.[38] However, the protective sweep yielded no incriminating evidence, the police had questioned a companion of the defendant's and allowed that person to leave, the defendant was twice given *Miranda* warnings and signed a written consent to search form with *Miranda* warnings on it, and the police repeatedly warned the defendant of his right to remain silent.[39] The Court also noted that, at the time consent was given, the officers' guns were no longer drawn.[40] Finally, the Court observed that the defendant guided the officers to his room and pointed out the location of narcotics present there.[41] Considering the totality of the circumstances, the Court concluded that the consent was voluntary.[42]

The present case shares several common factors with *Reasor.* In both cases: the defendant was under arrest, handcuffed, and inside the home with officers at the time consent was given; a protective sweep that yielded no evidence had been conducted beforehand; and the defendant guided officers in some way to the location of the room in which the defendant slept. The present case also differs in some respects from *Reasor,* with some factors be-

---

31. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim.App.1997).

32. *Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)

33. *Id.* at 39–40; *Meeks v. State,* 692 S.W.2d 504, 510 (Tex.Crim.App.1985).

34. *Meeks,* 692 S.W.2d at 509.

35. *See Martinez v. State,* 17 S.W.3d 677, 683 (Tex.Crim.App.2000)(trial court free to disbelieve testimony by mother and sister of the defendant that they did not in fact give consent to search).

36. 12 S.W.3d 813 (Tex.Crim.App.2000).

37. The protective sweep was illegal because the officer failed to articulate a single fact justifying it. *Id.* at 817. He never once stated that there was any reason to believe a third person was in the home who could pose a threat to the officers or the public, but, instead, stated that he considered the defendant's home to be a safe place. *Id.*

38. *Id.* at 818.

39. *Id.*

40. *Id.*

41. *Id.* at 819.

42. *Id.*

ing more favorable and others being less favorable. Unlike in *Reasor,* appellant was not given *Miranda* warnings, he was not constantly reminded of his right to remain silent, and he did not sign a written consent form containing *Miranda* warnings. However, officers did not arrest appellant with guns drawn, the protective sweep in this case was legal because the victim[43] or an accomplice[44] could potentially have been found inside, and the officers already had a valid arrest warrant, which constitutionally permits entry into the home to effectuate the arrest.[45] Under the totality of the circumstances, we find that the trial court did not abuse its discretion in finding that the consent to search was voluntary. Points of error thirteen through sixteen are overruled.

### 4. *Written confession*

In point of error seventeen, appellant contends that the trial court erred in admitting his written confession. He claims that his confession was procured by police officers with promises of leniency. He bases this claim on the following colloquy:

> [DEFENSE COUNSEL]: You made some comments in your—in your notes about some discussions regarding the death penalty with Mr. Derrick Johnson. Do—do you remember those discussions?
>
> [DETECTIVE SKELLY]: Generally speaking, towards the end of the interview, once he had made confessions to both of the—of the crimes, or, I take that back; after he confessed to the sexual assault and then we were talking about the homicide case, at some point— and I don't remember exactly what

point—he did ask us—he said, "If I tell you more about this, can you guarantee that I won't get the death penalty?"

> We told him, "No, we can't make such guarantees and will not." I said that "If you're honest with us and you tell us what happened, we will make that information known for the court's consideration to use however they see fit, but we will not—you know, we will not, cannot make any guarantees."
>
> [DEFENSE COUNSEL]: You—you did tell him, though, that—that honesty would be-his honesty would be communicated to the prosecutors and to the Court for whatever use they want to make of that.
>
> [DETECTIVE SKELLY]: That's— that's generally, yes.
>
> [DEFENSE COUNSEL]: Did that seem to help him, in terms of continuing to cooperate with you?
>
> [DETECTIVE SKELLY]: Well, I assume it did. He did continue and he gave us a voluntary statement. Yes, sir.

Appellant characterizes Detective Skelly's comments as an implied representation that appellant's honesty would or could result in the State deciding not to seek the death penalty. That is simply not the case. Detective Skelly plainly told appellant that the police could make no guarantees. Moreover, appellant initiated the idea of a deal to avoid the death penalty. "Having cast [himself] in the role of entrepreneur, [he] cannot expect an appellate court to find implied 'promises' in official responses (to [his] overtures) that are am-

---

43. *Colburn v. State,* 966 S.W.2d 511, 519 (Tex.Crim.App.1998)(emergency doctrine).

44. *Reasor,* 12 S.W.3d at 816 (protective sweeps).

45. *Wilson v. Layne,* 526 U.S. 603, 610–611, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)(citing *Payton v. New York,* 445 U.S. 573, 602–603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).

biguous at best."[46] Further, Detective Skelly's comments indicated that the police were without authority to make deals but instead could only relay information to the court and prosecutor.[47] Point of error seventeen is overruled.

## C. Punishment

### 1. *Parole*

■ In points of error two through four, appellant complains about comments made by the prosecutor that parole laws can change. Points of error two and three claim that defense counsel was ineffective for failing to object to these comments while point of error four contends that the comments constituted fundamental error. During the voir dire of three prospective jurors who ultimately served on the jury, the prosecutor told the jurors that, even though they would be informed that a person serving a life sentence must serve forty years before being eligible for parole, the jurors should not consider parole law at all because it was subject to change. The prosecutor did not say how parole law might change and did not tell the jurors that parole law would change in a way that would allow earlier release on parole.

The record does not reveal defense counsel's reasons for not objecting the prosecutor's comments. Given the presumption of effectiveness and the great deference we give to decisions made by defense counsel, we see nothing in the present record that would compel us to find counsel ineffective.[48] Points of error two and three are overruled. As for appellant's claim of fundamental error, we have already held that a failure to object

forfeits a claim that a prosecutor's comments about parole are incorrect or misleading.[49] Point of error four is overruled.

In point of error five, appellant contends that the trial court gave an erroneous instruction in the jury charge regarding parole. The jury charge provided:

Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those law will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted. *You are further instructed that you cannot consider how long the defendant might be required to serve a sentence that is imposed.* Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are no concern of yours.

(Emphasis in appellant's brief). Appellant did not object to this instruction. He now contends that the italicized portion was erroneous and egregiously harmed him by denying him a fair and impartial trial. He claims that the italicized instruction effectively requires the jury to ignore the earlier instruction that the defendant will serve forty calendar years before becoming eligible for parole and that such an effect

**46.** *Henderson v. State*, 962 S.W.2d 544, 564 (Tex.Crim.App.1997), *cert. denied*, 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 357 (1998).

**47.** *Id.*

**48.** *Thompson v. State*, 9 S.W.3d 808, 812–814 (Tex.Crim.App.1999).

**49.** *Valencia v. State*, 946 S.W.2d 81, 82–83 (Tex.Crim.App.1997).

would violate *Simmons v. South Carolina.*[50]

█ Appellant's reading of the instruction is incorrect. The italicized language does not require the jury to ignore the forty-year parole eligibility requirement but simply prevents the jury from speculating when the parole board would release a life-sentenced defendant.

In any event, the law did not require a parole instruction at appellant's trial. Although Article 37.071, § 2(e)(2)(B) now requires a parole instruction[51] to be given upon defense counsel's request, the amendment that added that provision applies only to offenses committed on or after September 1, 1999.[52] As for appellant's reliance upon *Simmons,* we have consistently rejected appellant's argument based on that case.[53] Point of error five is overruled.

### 2. *Challenge for cause/mitigating evidence*

█ In point of error six, appellant contends that the trial court erred in overruling his challenge for cause against prospective juror Thomason. Appellant contends that Thomason's refusal to consider youth as mitigating evidence violates the Supreme Court's holding in *Morgan v. Illinois.*[54] Appellant properly preserved er-ror by striking Thomason, asking for more strikes until the trial court denied his requests, and pointing to an objectionable juror. However, the trial court granted appellant an additional peremptory strike; to show harm, appellant must show that the trial court improperly denied challenges for cause on at least *two* different venire members.[55] Because appellant asserts only one challenge for cause error here, harm cannot be established.[56]

Even so, we rejected the substance of appellant's argument in *Morrow v. State.*[57] Appellant acknowledges that *Morrow* is contrary to his position. Point of error six is overruled.

### 3. *Death penalty challenges*

In points of error eighteen through twenty-one, appellant makes several constitutional challenges to the death penalty. He challenges the 12–10 rule,[58] the failure to define certain terms contained in the future dangerousness special issue,[59] and the Texas death penalty scheme's method of narrowing eligibility requirements while allowing unlimited consideration of mitigating evidence.[60] Having previously decided these claims adversely to appellant's position, we reject them now. Points of error eighteen through twenty-one are overruled.

---

**50.** 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

**51.** The statutorily required instruction does not include the language of which appellant complains.

**52.** Acts 1999, 76th Leg., ch. 140, § 2.

**53.** *Chamberlain,* 998 S.W.2d at 234–235.

**54.** 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

**55.** *Wright v. State,* 28 S.W.3d 526, 535 (Tex. Crim.App.2000), *cert. denied,* 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793 (2001).

**56.** *Id.*

**57.** 910 S.W.2d 471, 472–473 (Tex.Crim.App. 1995).

**58.** *Wright,* 28 S.W.3d at 537.

**59.** *Ladd,* 3 S.W.3d at 572–573.

**60.** *Hughes v. State,* 24 S.W.3d 833, 844 (Tex. Crim.App.), *cert. denied,* 531 U.S. 980, 121 S.Ct. 430, 148 L.Ed.2d 438 (2000).

### D. Cumulative error

In points of error twenty-two and twenty-three, appellant claims that the previously alleged errors are harmful in their cumulative effect. While a number of errors may be harmful in their cumulative effect, no such cumulative error has been shown here.[61] Points of error twenty-two and twenty-three are overruled.

The judgment of the trial court is affirmed.

JOHNSON, J., concurred.

PRICE, J., did not participate.