Mary Elizabeth **HARRISON**, Appellant,

v.

The **STATE** of Texas, State.

No. 2–03–153–CR.

Court of Appeals of Texas,
Fort Worth.

July 1, 2004.

Robert H. Rogers, Dallas, for Appellant.

Tim Curry, Crim. D.A., Charles M. Mallin, Asst. Crim. D.A., Chief of Appellate Division, Anne Swenson, David M. Curl, Alton Estrada, Asst. Crim. D.As., Fort Worth, for Appellee.

PANEL B: HOLMAN, GARDNER, and WALKER, JJ.

## OPINION

SUE WALKER, Justice.

### I. Introduction

Appellant Mary Elizabeth Harrison appeals her conviction for driving while intoxicated. After the trial court denied her motion to suppress, Harrison pleaded guilty pursuant to a plea agreement with the State. In accordance with the agreement, the trial court sentenced her to 180 days in jail, probated for two years, and imposed a $550 fine. The primary issues we address in this appeal are whether police possessed reasonable articulable suspicion to stop Harrison and whether the trial court erred by concluding that Harrison's consent to provide a urine specimen was voluntarily given.[1] Because a concerned citizen called 911 to report Harrison's erratic driving, followed Harrison, and reported Harrison's location to police, we hold that police possessed reasonable articulable suspicion justifying Harrison's stop. But because all of the witnesses at the suppression hearing that testified on the consent issue—two police officers and Harrison herself—agreed that Harrison consented to provide a urine specimen only after enduring five or six painful needle sticks during unsuccessful attempts to submit a blood specimen and only to avoid further needle sticks, we hold that the voluntariness of her consent was not established by clear and convincing evidence. Accordingly, we reverse the trial court's suppression ruling and remand this case to the trial court.

### II. Factual and Procedural Background

On August 8, 2002, at around 3:00 p.m., a police officer for the City of Arlington stopped Harrison's vehicle after Vickie Evans, a private citizen, called 911 to report Harrison's erratic driving.[2] Another Arlington police officer, Officer Charles Lodatto, arrived on the scene shortly after Harrison had been detained and spoke to Evans concerning Harrison's driving. According to Officer Lodatto, Evans telephoned 911 to report Harrison's erratic driving because she suspected that Harrison was either having a seizure or was intoxicated. Evans told Officer Lodatto that, as she followed Harrison's vehicle,

---

1. In its brief, the State points out that the record contains two conflicting certifications of Harrison's right to appeal and argues that Harrison has waived her right to appeal in this case. In light of the conflicting certifications by the trial court concerning Harrison's right to appeal, we abated this case and requested that the trial court conduct a hearing to determine whether Harrison had the right to appeal her pretrial motion to suppress. Following the hearing, in a supplemental clerk's record, the trial court certified Harrison's right to appeal the denial of her pretrial motion in the instant case.

2. Neither Evans nor the police officer who initiated the traffic stop testified at the suppression hearing.

she noticed that the vehicle was going from lane to lane and that Harrison "was flopping around like a fish" inside the vehicle.

After Officer Lodatto finished gathering information from Evans, he began interviewing Harrison. As he spoke with her, he noticed that Harrison "could not sit still" and that "[s]he was continuously fidgeting, moving around, bending around at the waist, [and] lifting up her legs." As a result, Officer Lodatto conducted several field sobriety tests to determine if Harrison was under the influence of drugs or alcohol. Although Harrison initially passed the HGN test, she failed both the walk-and-turn test and the one-leg-stand test, and she demonstrated a lack of convergence in her eyes. Based upon his observations of Harrison's behavior and her performance during the field sobriety tests, Officer Lodatto believed that Harrison was under the influence of an intoxicant other than alcohol. Officer Lodatto arrested Harrison for driving while intoxicated.

At the Arlington City Jail, Officer Lodatto asked Harrison to submit breath and blood specimens and read Harrison the required statutory warnings advising her of the consequences of refusing to submit such specimens. *See* TEX. TRANSP. CODE ANN. § 724.015 (Vernon Supp.2004). Harrison consented to provide both breath and blood specimens. Harrison first submitted a breath specimen, and the result of the breath test was negative for alcohol. Then Officer Lodatto and Officer Donna DeMott, another Arlington police officer, transported Harrison to Arlington Memorial Hospital so that medical personnel could obtain a blood specimen. At the hospital, a nurse made numerous unsuccessful attempts to draw a testable quantity of blood from Harrison's hand and the inside of her elbow. When the nurse be-

gan examining Harrison's feet as a possible site to draw blood, Officer DeMott asked Harrison if she would consent to providing a urine sample instead of continuing with efforts to obtain a blood specimen. Harrison agreed, and her urine specimen yielded positive results for controlled substances.

Harrison's pretrial motion to suppress and a memorandum filed in support of her motion alleged that the police lacked reasonable suspicion to detain her and that her consent with respect to the urine specimen was involuntary. On March 21, 2003, the trial court held a hearing on Harrison's motion to suppress and denied the motion. On April 21, 2003, Harrison entered a negotiated plea of guilty, and the trial court sentenced her to 180 days in jail, probated for two years, and imposed a $550 fine. This appeal followed.

### III. STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.-Fort Worth 2003, no pet.). At a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex.Crim.App.2000). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex.Crim.App.2002); *Best*, 118 S.W.3d at 861–62. However, we

review de novo a trial court's rulings on mixed questions of law and fact if they do not turn on the credibility and demeanor of witnesses. *Johnson*, 68 S.W.3d at 652–53.

## IV. STOP BASED ON REASONABLE ARTICULABLE SUSPICION

■■■ In her second issue, Harrison argues that the trial court erred by denying her motion to suppress because police lacked reasonable articulable suspicion to stop her vehicle. Law enforcement officers may stop and briefly detain persons suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); *Pipkin v. State*, 114 S.W.3d 649, 653 (Tex.App.-Fort Worth 2003, no pet.). The same standards apply whether the person detained is a pedestrian or is the occupant of an automobile. *Pipkin*, 114 S.W.3d at 653. To initiate an investigative stop, the investigating officer must possess a reasonable suspicion based on specific articulable facts that, in light of the officer's experience and general knowledge, would lead the officer to the reasonable conclusion that criminal activity is underway and the detained person is connected to the activity. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex.Crim.App.2001). These facts must amount to more than a mere hunch or suspicion. *Pipkin*, 114 S.W.3d at 654.

■■■ The information provoking the officer's suspicions need not be based on his own personal observations, but may be based on an informant's tip that bears sufficient "indicia of reliability" to justify a stop. *See Adams v. Williams*, 407 U.S. 143, 146–47, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972). Unsolicited information concerning a crime in progress provided to police in a face-to-face encounter by a concerned citizen who is not connected with police and is not a paid informant is inherently reliable. *United States v. Sierra–Hernandez*, 581 F.2d 760, 763 (9th Cir. 1978), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978); *State v. Fudge*, 42 S.W.3d 226, 232 (Tex.App.-Austin 2001, no pet.); *State v. Sailo*, 910 S.W.2d 184, 189 (Tex.App.-Fort Worth 1995, pet. ref'd); *see also United States v. Unger*, 469 F.2d 1283, 1287 n. 4 (7th Cir. 1972), *cert. denied*, 411 U.S. 920, 93 S.Ct. 1546, 36 L.Ed.2d 313 (1973). This is because in such situations the citizen puts himself in a position of being identified and being held accountable for his intervention. *Sierra–Hernandez*, 581 F.2d at 763; *Fudge*, 42 S.W.3d at 232; *Sailo*, 910 S.W.2d at 188. In fact, numerous Texas courts of appeals have upheld investigative stops based on unsolicited reports from concerned citizens. *See, e.g., Pipkin*, 114 S.W.3d at 653–54 (upholding stop based on unsolicited personal report to police by motorist who called police on his cell phone as he was driving near defendant and observed defendant driving erratically and smoking crack pipe); *Fudge*, 42 S.W.3d at 228, 232 (upholding stop based on cab driver's unsolicited personal report to officer about erratic driving); *State v. Garcia*, 25 S.W.3d 908, 911 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (upholding stop based on individual's unsolicited personal report of incident to police officer in parking lot, although individual left scene without giving name to police); *State v. Stolte*, 991 S.W.2d 336, 342–43 (Tex.App.-Fort Worth 1999, no pet.) (upholding stop based on unsolicited tip from informant who witnessed erratic driving, called police on cellular phone, followed vehicle, and waited at scene when stop was made).

The present facts—the 911 call by Vickie Evans to report Harrison's erratic driving and "flopping around like a fish" inside

the car—cause this case to fall squarely within the above-discussed line of cases. Evans was not connected with police and provided unsolicited information concerning a potential crime in progress, DWI, as she was personally observing the event. Thus, the information provided by Evans was sufficiently reliable to provide police with reasonable articulable suspicion to initiate an investigative stop of Harrison. *See, e.g., Pipkin,* 114 S.W.3d at 653–54; *Fudge,* 42 S.W.3d at 232; *Garcia,* 25 S.W.3d at 911; *Stolte,* 991 S.W.2d at 342–43; *Sailo,* 910 S.W.2d at 189. We overrule Harrison's second issue.

## V. Consent To Provide Urine Specimen Not Voluntary

In her first issue, Harrison contends that the trial court erred by finding that she voluntarily consented to provide a urine specimen. The State, however, maintains that it proved by clear and convincing evidence that Harrison's consent was voluntary.

Under the Fourth and Fourteenth Amendments, a search conducted without a warrant is per se unreasonable, subject only to a few established and well-delineated exceptions. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). A search conducted with the consent of the suspect is one such exception, so long as the consent is voluntary. *Id.* at 219, 93 S.Ct. at 2043–44. To show that the search was made with consent, the State must prove by clear and convincing evidence, based on the totality of the circumstances, that the defendant gave consent freely and

voluntarily.[3] *Reasor v. State,* 12 S.W.3d 813, 818 (Tex.Crim.App.2000); *Meeks v. State,* 692 S.W.2d 504, 509 (Tex.Crim.App. 1985); *State v. Hunter,* 102 S.W.3d 306, 310 (Tex.App.-Fort Worth 2003, no pet.). Voluntariness is to be determined from all the circumstances surrounding the consent. *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2059.

In order to be voluntary, consent must "not be coerced, by explicit or implicit means, by implied threat or covert force." *Carmouche,* 10 S.W.3d at 331 (quoting *Schneckloth,* 412 U.S. at 228, 93 S.Ct. at 2048). To be considered voluntary, a suspect's consent must not be the result of physical or psychological pressures from law enforcement. *Erdman v. State,* 861 S.W.2d 890, 893 (Tex.Crim.App. 1993). Thus, if consent is obtained through duress or coercion, whether actual or implied, that consent is not voluntary. *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2059; *Allridge v. State,* 850 S.W.2d 471, 493 (Tex.Crim.App.1991), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993); *Hunter,* 102 S.W.3d at 310. For example, if a person's consent is induced by an officer's misstatement of the consequences flowing from a refusal to submit to a test, the consent may be considered involuntary. *See Erdman,* 861 S.W.2d at 893–94.

Testimony by law enforcement officers that no coercion was involved in obtaining the consent is evidence of the consent's voluntary nature. *Martinez v. State,* 17 S.W.3d 677, 683 (Tex.Crim.App. 2000); *Hunter,* 102 S.W.3d at 311. A po-

**3.** Although the United States Constitution requires the State to prove the voluntariness of consent only by a preponderance of the evidence, the Texas Constitution requires the State to show by clear and convincing evidence that the consent was freely given. *Carmouche,* 10 S.W.3d at 331 (citing *State v.*

*Ibarra,* 953 S.W.2d 242, 245 (Tex.Crim.App. 1997)). In light of these cases, we decline to adopt the State's contention that pursuant to *Hulit v. State,* 982 S.W.2d 431 (Tex.Crim.App. 1998), the State has no burden to prove consent or the voluntariness of consent, but must prove only reasonableness of police conduct.

lice officer's failure to inform the accused that he can refuse consent is also a factor to consider in determining the voluntariness of consent; however, the absence of such information does not automatically render the accused's consent involuntary. *Johnson*, 68 S.W.3d at 653; *Hunter*, 102 S.W.3d at 311. Nor is consent rendered involuntary merely because the accused is under arrest. *Johnson*, 68 S.W.3d at 653; *Hunter*, 102 S.W.3d at 311. By the same token, consent is not established by showing no more than acquiescence to a claim of lawful authority. *Carmouche*, 10 S.W.3d at 331; *Hunter*, 102 S.W.3d at 311.

Four witnesses testified at the suppression hearing. Only Harrison, Officer Lodatto, and Officer DeMott testified regarding Harrison's consent to provide a urine specimen; Officer Rogelio Trevino, Jr. testified regarding Harrison's consent to provide a breath specimen and her breath test results. Both officer DeMott and Lodatto testified that Harrison was under arrest for driving while intoxicated when she consented to provide a urine specimen. They agreed that a nurse stuck Harrison's hands and arms five or six times with a needle and was able to withdraw some blood, but not a testable quantity. Officer DeMott testified that Harrison "appear[ed] to be in quite a bit of pain" from the repeated attempts to find a vein to complete the blood draw. When the nurse began examining Harrison's feet as a possible site to draw blood, Officer DeMott testified that she asked Harrison if she would "be willing to provide a urine sample instead of continuing with giving a blood sample." Officer DeMott testified that "in lieu of continuing to get poked, [Harrrsion] said, I'll give you a urine sample." [4]

Officer Lodatto testified that Harrison complained about being stuck so many times because it was painful. Officer Lodatto likewise explained, "The nurses could not find a—basically a vein or any way of really pulling blood from her and so she consented to a urine [sample]." He said that "Officer DeMott asked for the consent of the urine ... based on them not being able to get the blood."

Harrison said that her veins kept collapsing, making huge bruises each time she was stuck with the needle. She further testified that she "begged them to stop" sticking her. According to Harrison, she agreed to provide the urine sample because she wanted to avoid the pain of being stuck any more times with the needle.

During this time, neither Officer DeMott nor Officer Lodatto informed Harrison that she could refuse to provide the urine sample or that she would not lose her

---

4. Specifically, Officer DeMott testified as follows on direct examination:

Q. Tell the Court the efforts made to obtain a blood test from the Defendant.
A. The nurse attempted, I would say, approximately five to six times to obtain a blood sample. Ms. Harrison was very cooperative the whole time, tried to work with the nurse to—to assist her in getting the sample. She would instruct the nurse on how best to try to take it. Ms. Harrison did also appear to be in quiet a bit of pain from the nurse attempting to obtain the sample.
Q. At some point were the efforts to obtain a blood test stopped?

A. Yes. When it appeared it was causing Ms. Harrison a lot of pain, I mentioned to her would she be willing to provide a urine sample instead of continuing with giving a blood sample.
Q. And what was her response to your offer to give a urine sample?
A. She continued being very cooperative and agreed readily to provide one.
Q. So in lieu of continuing to get poked, she said, I'll give you a urine sample?
A. Yes.

driver's license if she did not provide the urine sample. According to Officer Lodatto, he did not give Harrison the statutory warnings prior to her consent to the urine specimen. Nonetheless, he testified that after Harrison had consented to provide the urine specimen, he added "urine" to the form entitled "Statutory Warnings" to indicate that Harrison consented to provide a urine specimen, as well as a blood and a breath specimen.

Harrison denied that she freely and voluntarily consented to provide the urine specimen. She testified that her license was very important to her and that she consented to provide the breath and blood specimens specifically because she did not want to lose her license. She further testified that she was not informed that the consequences with respect to refusal of breath and blood specimens did not apply with respect to the urine specimen. According to Harrison, she would have refused to provide a urine specimen had she known that she would not have had her driver's license suspended. Harrison testified that she believed taking the urine test "was the same as taking a—a blood test."

Reviewing the totality of the circumstances surrounding Harrison's consent, we hold that the State did not meet its burden to prove by clear and convincing evidence that Harrison's consent was voluntary. Officer DeMott requested Harrison's consent to provide the urine specimen while she was in custody and while she was undergoing repeated painful needle sticks. The witnesses in the hospital room—Harrison and Officers DeMott and Lodatto—all testified that Harrison was in pain and agreed to provide the urine specimen so that she would not be stuck with the needle again. The fact that Harrison's consent was given to avoid painful physical pressures—more needle sticks, probably in

her feet—weighs against its voluntariness. *See Erdman*, 861 S.W.2d at 893; *accord Rayford v. State*, 125 S.W.3d 521, 529 (Tex. Crim.App.2003) (recognizing consent was voluntary despite claims that defendant's medical condition rendered it involuntary where no evidence existed that defendant was suffering pain). In addition, while neither officer verbally misstated the consequences flowing from Harrison's refusal to provide a urine specimen, both officers testified that they did not inform Harrison that she could refuse to consent to provide a urine specimen or that the consequences of refusing a breath or blood specimen were inapplicable to their request for a urine specimen. *See* TEX. TRANSP. CODE ANN. § 724.011(a) (Vernon 1999), § 724.015(2); *Johnson*, 68 S.W.3d at 653; *see also Erdman*, 861 S.W.2d at 893–94 (recognizing importance of ensuring that consent is given with a correct understanding of the actual statutory consequences of refusal). Because all three witnesses at the suppression hearing agreed that Harrison was in pain and agreed to provide the urine specimen to avoid further needle sticks, agreed Harrison was not advised of her right to decline to provide a urine specimen, and agreed Harrison was not informed her license would not be suspended if she refused, we cannot hold that the State met its heightened burden to prove voluntariness of Harrison's consent under the totality of the circumstances by *clear and convincing* evidence.[5] Consequently, we hold that the trial court abused its discretion by concluding that Harrison freely and voluntarily consented to provide the urine specimen. Accordingly, we sustain her first issue.

## VI. CONCLUSION

Having sustained Harrison's first issue on appeal, we reverse the trial court's

---

5. Although the visiting judge denied Harrison's motion to suppress, he recognized that the "introduction of the urine test ... [was] a little closer question for the Court."

judgment and remand the case for a new trial.