

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00272-CR

_____

RICARDO LUCIO SILVA, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. 57,985-C

Before Sudderth, C.J.; Meier and Kerr, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

In three issues, Ricardo Lucio Silva challenges his conviction and 45-year sentence for possession of more than one but less than four grams of methamphetamine. *See* Tex. Health & Safety Code Ann. § 481.102(6) (West Supp. 2018), § 481.115(c) (West 2017); Tex. Penal Code Ann. §§ 12.32, 12.34 (West 2011), § 12.42(d) (West Supp. 2018). He contends that the trial judge reversibly erred by (1) denying his motion to suppress, (2) admitting into evidence, over his rule 403 objection, two baggies containing an untested substance that police found in his coat pocket, and (3) excluding his requested jury-charge instruction about the untested substances. We affirm.

## Motion to Suppress[1]

Silva's first issue challenges the trial judge's denial of his motion to suppress all evidence collected by the Wichita Falls police from their contact with him and his girlfriend while they were walking outside an apartment complex. Silva contends that the police detained him without reasonable suspicion or probable cause at the contact's outset.

### Standard of Review and Applicable Law

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007);

---

[1]We dispense with a separate recitation of the factual background because we review the facts in our discussion of the suppression motion.

*Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not so turn. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). When the issues raised in suppression hearings are consensually relitigated before the jury, in our review we consider the evidence from both stages. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App.), *cert. denied*, 519 U.S. 1043 (1996); *Siddiq v. State*, 502 S.W.3d 387, 392 (Tex. App.—Fort Worth 2016, no pet.).

The law categorizes police–citizen interactions into three types: (1) consensual encounters that do not implicate the Fourth Amendment, which citizens are free to terminate at any time; (2) investigative detentions, which are Fourth Amendment seizures of limited scope and duration that must be supported by a reasonable suspicion of criminal activity; and (3) arrests, which are the most intrusive of Fourth Amendment seizures and require probable cause. *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016); *State v. Woodard*, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011). We review de novo whether a police–citizen contact was a consensual encounter or an investigative detention and at what point the former became the latter. *Furr*, 499 S.W.3d at 877. No bright-line rule exists; instead, we must examine the totality of the circumstances surrounding the contact to determine whether a

reasonable person would have felt free to ignore the officer's request or to terminate the contact. *Id.* This test is objective and does not rely on the contacted person's or police officer's subjective belief. *Id.* at 668. Nor does this test take into account whether the officer communicated that the citizen was free to terminate the encounter. *Woodard*, 341 S.W.3d at 411.

An officer does not need any information about a possible crime to stop a citizen and ask questions. *Id.* And this type of encounter is not a "seizure" without the sort of evidence typically associated with one, evaluated in light of the surrounding circumstances: display of a weapon, physical touching, the threatening presence of multiple officers, or a direct order or other use of language or tone of voice indicating that the person was compelled to comply with an officer's request. *Id.* at 413; *see, e.g.,* *Crain v. State*, 315 S.W.3d 43, 49–50 (Tex. Crim. App. 2010) (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980)). Although we consider all the surrounding circumstances of the contact, including time and place, the officer's conduct factors in most importantly when deciding whether an interaction was consensual or whether it constituted a Fourth Amendment seizure. *Woodard*, 341 S.W.3d at 411.

**Facts Adduced at Suppression Hearing and at Trial**

At the suppression hearing, the trial judge listened to Wichita Falls police officer Tristan Dozier's testimony and watched his dashcam video. Although Officer Dozier's interaction with Silva and his companion occurred off camera, the officer's

4

body microphone captured the conversation. Officer Dozier also testified at trial. Silva renewed his earlier objections to the evidence officers found as a result of their contact, and the trial court overruled them all.

Officer Dozier testified that when he was on evening patrol around 9:30 p.m.,[2] he noticed a woman walking in a field behind a McDonald's pushing an empty baby stroller. He thought she looked suspicious because "[you] don't see . . . people every day walk around pushing empty baby strollers through a field." As Officer Dozier was watching the woman, he also saw a man pushing an unladen dolly down a nearby roadway; the man met the woman in the field, and they both walked to the back of an apartment complex. Officer Dozier thought the two either might have stolen the stroller and dolly or were about to commit a burglary or theft, a problem in the apartment complex's area.

Officer Dozier drove to the apartment complex and at first did not see the couple. But when he approached the front of one of the buildings, he saw them come out of an apartment entryway. Officer Dozier stopped his car in the middle of the street, angling it only slightly toward the buildings; he turned off his headlights and did not turn on the car's overhead lights. Officer Dozier got out of the car and walked up to the couple. Although the woman was still pushing the empty stroller, the man

---

[2]Because it was January, it was dark outside.

no longer had the dolly. Officer Dozier thought the man might be hiding something, but it turned out that he was holding something.

On the video, we can hear Officer Dozier first ask, "What's that?" and then more loudly, "What's in your hand?"[3] He then says, "Put it down for me real quick." The tone of Officer Dozier's voice sounds more like a request than an order. He then asked the woman and the man, whom he identified in court as Silva, if they had any identification with them. He also asked a series of questions: where the man had put the dolly, where they lived, and what they were doing in the apartment complex. Although Silva and the woman talked over each other, we can hear the woman more clearly on the audio recording that accompanied the video. She told Officer Dozier that she was there to "dumpster dive"[4] and that she and Silva—her boyfriend—did not live in the complex. Although the woman gave Officer Dozier her license, Silva said that he did not have one; the woman told the officer Silva's name. Silva said that

---

[3]Silva responded, "Uh," and the woman's response sounds like "a fishing pole thing." Officer Dozier clarified in his testimony that Silva was holding both the backpack and a fishing pole.

[4]Officer Dozier testified that dumpster diving is a criminal offense in the city of Wichita Falls. Section 90-65 of the Wichita Falls Code prohibits a person from "pilfering" or "meddling with" solid waste receptacles in any alley or street. Wichita Falls, Tex., Code of Ordinances ch. 90, art. II, § 90-65 (2018); *see also id.* ch. 1, § 1-14 (providing general penalties for violating code).

he had left the dolly in a breezeway and mentioned something about diabetic supplies.[5]

About two minutes after Officer Dozier began speaking to the couple, Silva volunteered that he knew their behavior was strange, and Officer Dozier said, "That's why I stopped y'all." But he did not tell them that they were under arrest or that they were not free to leave. As Officer Dozier was talking to the couple, he "felt like they were both really nervous"; talking "really fast, mumbling through their words"; and answering each other's questions. About two and a half minutes into the conversation, Officer Felts arrived.

Officer Dozier continued talking with Silva and his girlfriend. Silva mentioned that he had come to the apartment complex earlier about the diabetic supplies. When Officer Dozier again asked Silva directly for his name, Silva gave it to him. In response to further questioning, Silva's girlfriend told Officer Dozier that she was on parole, and Silva told him that he had past charges in neighboring Clay County. Officer Dozier then called in to dispatch to check whether either of them had outstanding warrants.

While waiting to hear back, Officer Dozier discussed with the couple why he had noticed them. He then asked, "What's in the backpack?" and the woman said,

_____

[5]Much of what Silva voluntarily said to Officer Dozier is unintelligible.

7

"probably nothing"[6] and explained that the backpack belonged to someone else. Officer Felts warned Silva not to dig in the backpack. According to Officer Dozier, Silva's actions would concern any officer because he could have been trying to hide or destroy evidence or access a concealed weapon. A little over a minute later, Officer Dozier asked Silva if the backpack contained anything illegal; Silva answered no. Then asking Silva if he could look in the backpack, according to Officer Dozier Silva answered "sure."[7]

Shortly after, Officer Dozier told Silva that he was being detained and said that he had found needles, which can be drug paraphernalia. Officer Dozier asked Silva, "You're not diabetic?" and Silva said no. Officer Dozier also told Officer Felts that a nearby pipe on the ground was probably Silva's although he had not seen Silva drop one. According to Officer Dozier's testimony, until he told Silva that he was detaining him, the officer had done nothing to restrain the two and was just having a conversation with them.

About eleven minutes after Officer Dozier began talking to Silva and his girlfriend, dispatch informed Officer Dozier that Silva had outstanding traffic-offense warrants, and Officer Dozier then arrested him. He told Silva's girlfriend that she was free to go.

---

[6]Officer Dozier explained that Silva was holding the backpack, and Officer Dozier directed his questions about the backpack to Silva.

[7]We cannot decipher Silva's response from the recording.

After arresting Silva, Officer Dozier searched the backpack and found a blue, clear baggie with "a white crystal-like substance"—methamphetamine—inside a magnetic key holder. Meanwhile, Officer Felts searched Silva and found in his coat pocket an Altoids tin with two baggies containing a similar-looking substance and several other empty baggies. According to Officer Dozier, empty baggies are used for packaging and distributing narcotics. After seizing the methamphetamine, Officer Dozier allowed Silva's girlfriend to leave with the backpack; Silva called her over and asked her to take it and "just get the stuff of mine."

**Denial of Suppression Motion Proper**

Considering Officer Dozier's conduct and the surrounding circumstances, we conclude that his contact with Silva began as a consensual encounter and that Officer Dozier developed reasonable suspicion to detain Silva after his girlfriend admitted being at the apartment complex to dumpster dive. *See id.* at 412–14; *Howard v. State*, 932 S.W.2d 216, 218–19 (Tex. App.—Texarkana 1996, pet. ref'd). Although Officer Dozier did affirmatively tell Silva to put down whatever he was holding, his tone was more of a request than an order, he was not unduly forceful, and he did not order Silva and his girlfriend to answer his questions. Officer Dozier did not drive his patrol car up to Silva, block them in, or turn on the car's lights or sirens, and there is no evidence that he shined any light toward Silva or his girlfriend.

The circumstances and conduct here closely resemble those in *Murry v. State*. No. 06-07-00183-CR, 2008 WL 2962105, at *1–2 (Tex. App.—Texarkana Aug. 1,

2008, pet. ref'd) (mem. op., not designated for publication). In *Murry*, an officer who had gotten a call about a suspicious person with a baseball bat stopped the defendant—who was holding a bat—on a public street at 2:00 a.m., asked him to put down the bat, and began asking him questions. *Id.* The court of appeals rejected the appellant's argument that the contact had started as an investigative detention rather than a consensual encounter. *Id.* at \*2. We agree with that court's reasoning and apply the same principle here. We hold that the trial court correctly denied Silva's motion to suppress.[8]

We overrule Silva's first issue.

## Rule 403 Complaint

In his second issue, Silva argues that the trial court abused its discretion by admitting into evidence and over his preserved rule 403 objection[9] State's exhibits 7 and 8: the two baggies containing a white, crystal-like substance that Officer Felts found in Silva's coat pocket after Officer Dozier arrested him. According to Silva, because the Department of Public Safety laboratory did not test the substances in those baggies to confirm whether they were illegal controlled substances,[10] the trial court's admitting them as evidence unduly prejudiced him because the jury could have assumed that the substances were methamphetamine and erroneously convicted him

---

[8]We do not reach Silva's argument that he did not validly consent to Officer Dozier's search of the backpack because Silva's counsel expressly told the trial court that he was not challenging the search of either the backpack or Silva. *See Foster v. State*, 874 S.W.2d 286, 289 (Tex. App.—Fort Worth 1994, pet. ref'd).

of the possession offense based solely on *those* unidentified substances rather than the confirmed methamphetamine in the backpack.

In conducting a rule 403 balancing test, a court must balance (1) the proffered item of evidence's inherent probative force along with (2) the proponent's need for that evidence and then balance those factors against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the evidence's probative force would give it undue weight, and (6) the likelihood that presenting the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Alami v. State*, 333 S.W.3d 881, 889 (Tex. App.—Fort Worth 2011, no pet.). The rules of evidence favor admitting relevant evidence and presume that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 832 (1997).

---

[9]Silva filed a written rule 403 objection, which the trial court denied at the pretrial hearing. At trial, the court granted him a running objection on the same ground when the State offered the evidence. Thus, Silva preserved his complaint. *See* Tex. R. App. P. 33.1; Tex. R. Evid. 103(a), (b).

[10]A chemist testified that although the State delivered three baggies to the DPS lab together, she tested only the contents of exhibit 5—the methamphetamine in the backpack—in accordance with DPS's policy not to test anything "over the highest penalty item or items."

Because the untested substances in exhibits 7 and 8 strongly resembled in both appearance and packaging the methamphetamine found in the backpack, they were probative to rebut Silva's contention that he got the backpack from someone else and thus did not knowingly possess the methamphetamine in the backpack. Whatever the baggies' contents, Silva's possession of them simultaneously with the methamphetamine in the backpack—and in the same container with empty baggies commonly used to package illegal drugs—was consistent with an intent to possess what purported to be illegal drugs. Exhibits 7 and 8 thus had inherent probative value for which the State had a need.

Silva contends that the jury could have disbelieved the chemist's testimony that the substance from the backpack was methamphetamine but mistakenly believed, without proof, that the substances in the two baggies were methamphetamine, thus suggesting a high risk that the jury mistakenly convicted him for an unproved offense. But the evidence showed that the State submitted all three baggies to the lab together and that the lab chose to test only the baggie found in the backpack because even if the substances in exhibits 7 and 8 contained methamphetamine, their weight would not have elevated the possession offense to a higher penalty. *Compare* Tex. Health & Safety Code Ann. § 481.115(c) (providing that possession of more than one but less than four grams of methamphetamine is a third-degree felony), *with id.* § 481.115(d) (setting penalty for possession of four or more but less than two hundred grams of methamphetamine as a second-degree felony).

12

Moreover, the State urged the jury to convict solely on the contents of exhibit 5 (the methamphetamine from the backpack), not exhibits 7 and 8. The risk was low, then, that the jury would be confused, would decide on an improper basis, or would give undue weight to exhibits 7 and 8. And the State did not spend a significant amount of time developing this evidence; it was but one piece in the puzzle explaining what the police found in Silva's possession that night.

Accordingly, we hold that the trial court did not abuse its discretion by admitting exhibits 7 and 8 over Silva's rule 403 objection. We overrule Silva's second issue.

## Jury-Charge Complaint

Silva's final issue challenges the trial court's denial of his requested jury instruction: "You are instructed that the State has failed to prove the contents of state[']s exhibit[s] 7 and 8 to be a controlled substance and you cannot consider the substance to be methamphetamine in arriving at your verdict." According to Silva, the jury needed the instruction because his possession of the baggies constituted an extraneous offense, and the State could not prove that offense beyond a reasonable doubt without test results indicating that the baggies contained a controlled substance.

The trial court must charge the jury with the applicable law without opining on the evidence's weight. Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). A trial judge errs by instructing a jury about a certain evidentiary item's sufficiency unless some statute or rule requires the instruction. *Kirsch v. State*, 306 S.W.3d 738, 747 (Tex.

13

Crim. App. 2010); *Brown v. State*, 122 S.W.3d 794, 799 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 938 (2004). Conversely, a trial court does not err by refusing an instruction that is tantamount to such an opinion. *See Kirsch*, 306 S.W.3d at 747.

Silva's requested instruction improperly comments on the evidentiary weight of exhibits 7 and 8. Silva has not identified any rule or statute requiring such an instruction. And contrary to his assertion that "the State must prove that any substance is in fact what it is alleged to be, i.e.[,] methamphetamine," the State need not have done so to prove a possession offense for all three baggies. *See Melton v. State*, 120 S.W.3d 339, 341 (Tex. Crim. App. 2003); *Gabriel v. State*, 900 S.W.2d 721 (Tex. Crim. App. 1995). Thus, the jury could have considered the baggies to be part of the total seized contraband. Moreover, the trial court was not required to remind the jury what it already knew: that the lab did not test the substances in exhibits 7 and 8 to confirm their contents. In this case, the tested amount from the backpack exceeded the minimum weight of the charged offense, an expert explained her testing techniques and results, and the trial court allowed the jurors to examine the untested evidence themselves. Silva's requested instruction would have improperly commented on the evidentiary (but not literal) weight, and the trial court thus did not err by denying it. We overrule Silva's third issue.

## Conclusion

Because we have determined that the trial court did not reversibly err and have therefore overruled each of Silva's issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 20, 2018