

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-14-00074-CR

PHINNY PAUL NORTON                                          APPELLANT

V.

THE STATE OF TEXAS                                               STATE

----------

## FROM THE 43RD DISTRICT COURT OF PARKER COUNTY
## TRIAL COURT NO. CR13-0708

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Trooper Cary Brasher stopped the vehicle that appellant Phinny Paul Norton was driving for speeding, searched the vehicle, and ultimately discovered a small amount of methamphetamine. Norton pleaded guilty to possession of a controlled substance of less than one gram in exchange for three years' deferred

---

[1]See Tex. R. App. P. 47.4.

adjudication community supervision, a $1,250 fine, and various other terms and conditions after the trial court denied his motion to suppress. In two points, he appeals the denial of his motion to suppress.[2] We affirm.

## II. Factual and Procedural Background

On February 4, 2013, at around 7:50 p.m., Trooper Brasher was concentrating on westbound traffic near mile marker 392 on Interstate 20 when he stopped Norton for driving 83 miles per hour in a 65-mile-per-hour zone. After some general conversation with Norton and his passengers—his girlfriend Jennifer and Jennifer's son—Trooper Brasher asked Norton for consent to search the vehicle.

Trooper Brasher said that when he asked Norton for consent to search the vehicle, Norton replied, "I don't have a problem with it."[3] But when Trooper Brasher asked Norton if he was responsible for everything inside the vehicle, Norton responded that it was not his vehicle and that the vehicle belonged to

---

[2]In his first point, Norton complains that the trial court reversibly erred by failing to make and include findings of fact and conclusions of law. We abated the appeal and remanded the case to the trial court to make findings of fact and conclusions of law, and the trial court did so. Therefore, this point is now moot.

[3]Norton testified that he said, "Well, it's not my car, but other than that, I wouldn't have a problem." The dashboard camera recording indicates that Norton twice said, "I *don't* have a problem with it." [Emphasis added.]

Jennifer.  According to Trooper Brasher, he then reconfirmed with Norton that he had consent to search the vehicle,[4] and this time Norton told him, "Go ahead."[5]

At some point, Trooper Brasher ran the vehicle's registration, which eventually came back as registered to Jennifer's mother. Although Trooper Brasher testified that he did not ask Jennifer for consent to search the vehicle because he was under the impression that she was not the vehicle's owner, the dashboard camera recording shows Norton's and Jennifer's claims that she was the owner began as soon as Trooper Brasher inquired about searching the vehicle and continued throughout their encounter with him.  Further, the recording shows that Trooper Brasher did not learn that the car was registered in Jennifer's mother's name until well after the methamphetamine was found and Norton had been handcuffed and arrested.  Nevertheless, there is no evidence in the record that Jennifer objected to the search, asked that the troopers stop the search, or refused consent.[6]  At most, while the search was ongoing, she said, "This is my car. Nobody asked me."

---

[4]Trooper Brasher testified that he asked Norton for consent because Norton was in care, custody, and control of the vehicle as its operator.

[5]However, the dashboard camera recording indicates that Norton actually said, "But like I said, it's not my car.  I mean you're welcome . . . you have my consent . . . it's her car."

[6]Nor is there any evidence that she gave consent.  But Jennifer was not arrested or charged with any crime as a result of the search of the vehicle.

3

Trooper Brasher testified that at one point he asked Norton whether there was anything illegal in the vehicle. Norton replied in the negative and then pulled a traffic citation out of his pocket and added, "You know, I've already been searched once tonight. I've already been stopped."[7]

Trooper Brasher then contacted Trooper Carson Bening, the trooper who issued the citation,[8] and at the conclusion of the conversation he returned to Norton and, for some reason that is not clear in this record, Trooper Brasher then commented to Norton, "I always go on this side . . . I carry a gun." Trooper Brasher then reconfirmed with Norton that he had consent to search the vehicle, and he was in the process of searching the vehicle when other troopers arrived to assist him.

The dashboard camera recording showed—and Trooper Brasher confirmed—that during the search Trooper Basher began questioning Norton about a small, locked bag he had found in the trunk. Trooper Brasher showed the bag to Norton and asked, "Do you have the key to this?" and "Can you open

---

[7]The dashboard camera recording showed that Norton's remark actually came earlier, in response to Trooper Brasher's question about whether Norton was responsible for everything in the car. The trial court admitted the ticket, which reflected that Norton had been stopped at 6:25 p.m. and had received a citation for open container in the vehicle and an expired inspection certificate. Norton had also received a warning for speeding.

[8]The dashboard camera recording contains Trooper Brasher's one-sided conversation with Trooper Bening wherein he relates that Norton said that he did not really want to be searched again because "this other trooper down the road just stopped [him]."

4

it for me?"  Norton replied, "Do you have a warrant?"  The two then engaged in a back-and-forth discussion about the location of the key and the contents of the bag.[9]  While this discussion was taking place, Trooper Josh Moore continued searching inside the vehicle's trunk, which contained several duffle bags.  A few minutes later, Trooper Moore discovered a clear bag, containing what the troopers believed, through training and experience, to be methamphetamine, concealed in a Crown Royal bag that was wrapped inside a pair of cargo shorts inside the bag he was searching.[10]  Trooper Brasher and Norton's conversation about the locked bag and the key was interrupted when Trooper Moore emerged from the trunk area, approached Trooper Brasher and Norton, asked Norton whose bag it was "in the back" (apparently referring to the trunk), and informed Norton that he had found methamphetamine in it.  Trooper Brasher turned to Norton and asked him if the "big black bag" was his.  Norton confirmed

---

[9]Responding to Norton's question about the warrant, Trooper Brasher responded, "It was in your vehicle," and then Norton replied, "I don't have the keys with me."  Trooper Brasher then asked, "What's in it?"  Norton responded with a remark that the keys were in the car.  Trooper Brasher followed-up by asking, "Can I open it if I find the keys?"  At first, Norton said yes and then he said that if Trooper Brasher got the keys out, he would open it for him.  Norton explained that the bag contained his medicine, some money, and other "stuff" that he did not want anyone getting into.

[10]Norton testified that there were five or six bags in the trunk; Norton said that one of the bags was his, two or three bags belonged to Jennifer, and two or three belonged to Jennifer's son.  Norton stated that none of the officers asked who owned which bags.

that it was his bag,[11] but he said he had never seen the methamphetamine there before and did not know why it was in his bag.[12]

Trooper Brasher testified that Norton was not handcuffed, detained or under arrest at any point prior to the time that Trooper Moore found the methamphetamine and that he read Norton's *Miranda* warnings to him after the discovery and asked Norton if he knew to whom the methamphetamine belonged. Norton said he did not. At that point, Trooper Brasher placed him under arrest for possession of methamphetamine. Norton then reiterated that the black bag was his. The trooper repeated that the black bag was where they had found the methamphetamine and then placed Norton in handcuffs.

Norton filed a motion to suppress (1) "all tangible evidence seized on or about February 4, 2013" from him or the vehicle he was driving, "including, but not limited to methamphetamine"; (2) all of his oral or written statements made at the time of and subsequent to his arrest and search "and/or search of the vehicle"; and (3) the testimony of any law enforcement officers about statements or evidence acquired or seized with regard to the search and seizure. The trial court denied the motion, and this appeal followed.

---

[11]Norton does not complain about this statement on appeal, and, as stated below, he repeated the same incriminating statement after receiving his *Miranda* warnings.

[12]Norton implicated Jennifer, claiming that she had insisted on packing the bags at the motel and had become angry when he had tried to pack the bags.

6

## III. Suppression

Norton argues that his consent to search was not voluntary and hence invalid.[13]

## A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.

---

[13]We note that except for a general reference to the contents of the motion to suppress and to "the actions that flowed" from his detention, Norton provides no briefing on appeal with regard to whether his statements were voluntary. *See* Tex. R. App. P. 38.1(i); *cf.* Tex. Code Crim. Proc. Ann. art. 38.22, § 6 (West 2005 & Supp. 2014); *Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004).

7

*Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When, as here, the trial court has made explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

## B. Applicable Law

In his second point, Norton argues that his consent was nothing more than "a submission to a claim of authority" and hence invalid. Specifically, Norton complains that Trooper Brasher's awareness that the vehicle had been searched earlier that evening and that Norton did not want it to be searched again, along with Trooper Brasher's comment about carrying a gun made just before he requested consent, rendered Norton's consent involuntary. He further argues

8

that his detention "was delayed well beyond the ordinary time associated with issuing a traffic citation."[14]

With regard to the validity of a consent to search, the court of criminal appeals has stated that it

> is a question of fact to be determined from all the circumstances. A person's consent to search can be communicated to law enforcement in a variety of ways, including by words, action, or circumstantial evidence showing implied consent. "But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." The voluntariness of a person's consent is also a question of fact that is determined by analyzing all of the circumstances of a particular situation. The trial judge must conduct a careful sifting and balancing of the unique facts and circumstances of each case in deciding whether a particular consent search was voluntary or coerced.

> "Reasonableness" is the touchstone for the Fourth Amendment; "reasonableness" is also the touchstone for determining voluntary consent to search. The Supreme Court has explained, that "the standard for measuring the scope of consent under the Fourth Amendment is that of 'objective' reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect?" In other words, courts review the totality of the circumstances of a particular police-citizen interaction from the point of view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen. The ultimate question is whether the person's "'will ha[s] been overborne and his capacity for self-determination critically impaired,'" such that his consent to search must have been involuntary.

---

[14]The dashboard camera video indicates that 50 minutes elapsed between the initial stop and Norton's arrest. However, within the first four minutes of the stop, Norton had twice consented to the search. He consented again five minutes into the stop and again around the ten-minute mark. There is no evidence that Norton ever withdrew consent during the 50-minute period.

Under federal law, the government must show voluntary consent by a preponderance of the evidence, but Texas has long stated that the State must "prove the voluntariness of a consent to search by clear and convincing evidence." While this burden differs somewhat from that employed in the federal system, the legal analysis is the same in both Texas and federal courts: whether consent was voluntary is a factual question and must be analyzed based on the totality of the circumstances. Trial courts may consider numerous factors in that analysis.

*Meekins v. State*, 340 S.W.3d 454, 458–60 (Tex. Crim. App. 2011) (citations omitted). Factors that the trial court may consider include, among others, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances. *Id.* at 460 n.26. Another factor to consider is whether the appellant was told during the exchange that he had a right to refuse consent. *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000). However, failing to inform the accused that he can refuse consent does not automatically render his consent involuntary. *Johnson v. State*, 68 S.W.3d 644, 653 (Tex. Crim. App. 2002). Because issues of consent are necessarily fact-intensive, a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous. *Meekins*, 340 S.W.3d at 460.

Additionally, consent to search is not rendered ineffective merely because it comes immediately upon completion of a traffic stop. *See James v. State*, 102 S.W.3d 162, 173 (Tex. App.—Fort Worth 2003, pet. ref'd) ("[R]easonable suspicion is not required for a police officer to request consent to search an automobile after the reason for an initial stop is concluded as long as a message

10

is not conveyed that compliance is required."); *see also Magana v. State*, 177 S.W.3d 670, 673 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (stating that an officer can request consent to search during a traffic stop as long as the stop is not prolonged beyond its normal duration if consent is refused); *cf. Lambeth v. State*, 221 S.W.3d 831, 834, 837–38 (Tex. App.—Fort Worth 2007, pet. ref'd) (op. on reh'g) (stating that officer, who told appellant that he was not free to leave, had reasonable suspicion before appellant refused consent).

## C. Analysis

In its findings of fact, the trial court found that Trooper Brasher lawfully stopped Norton for the offense of speeding[15] and that Norton twice gave the trooper voluntary verbal consent to search the vehicle that he was operating. The record supports this interpretation. *See Meekins*, 340 S.W.3d at 462–63 (concluding that trial court could reasonably have interpreted appellant's "I guess" in response to request for consent to search as a positive response). In fact, as explained above, the dashboard camera footage actually records four such instances of verbal consent. And although Norton complains that he did not have authority to give consent to search the vehicle, common authority to give consent derives from the mutual use of property, not the ownership or lack thereof. *Maxwell v. State*, 73 S.W.3d 278, 281–82 (Tex. Crim. App.) (holding that

---

[15]An officer has probable cause to stop and arrest a driver if he observes the driver commit a traffic offense. *State v. Gray*, 158 S.W.3d 465, 469–70 (Tex. Crim. App. 2005); *see State v. Ballman*, 157 S.W.3d 65, 70 (Tex. App.—Fort Worth 2004, pet. ref'd).

11

employee who had mutual use and control over the vehicle he was driving had authority to give consent to search it without assistance or permission from vehicle's owner), *cert. denied*, 537 U.S. 1051 (2002).[16]

While the evidence establishes that Norton was not advised that he could refuse consent, that fact, standing alone, does not render consent involuntary. *Johnson*, 68 S.W.3d at 653; *see United States v. Drayton*, 536 U.S. 194, 206, 122 S. Ct. 2105, 2113 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search."); *see also Perez v. State*, No. 03-12-00041-CR, 2013 WL 4822915, at *3 (Tex. App.—Austin Aug. 29, 2013, no pet.) (mem. op., not designated for publication) ("An officer is not required to expressly inform someone she is free to refuse consent

---

[16]A warrantless vehicle search based on the driver's consent, but without the consent of the passenger who claims to be the vehicle's owner, is not per se unreasonable. *See State v. Copeland*, 399 S.W.3d 159, 159–60, 162 (Tex. Crim. App. 2013) (declining to apply *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515 (2006), under which a co-tenant can disallow police to search a residence after a fellow tenant has consented to the search, to vehicular searches). The court of criminal appeals reasoned that the principles underlying *Randolph* weighed against treating vehicles as mobile "castles." *Id.* at 164. While the court also acknowledged that "fluid events" may occur during a traffic stop that can change the positions of the occupants in the "hierarchy of the vehicle" with regard to control over it, *see id.* at 164–65, and the record reflects that Trooper Brasher did not ask Jennifer for consent to search and that Jennifer complained that "[n]obody asked [her]," she was not charged with an offense, and Norton expressly consented to the search. *Cf. Houston v. State*, 286 S.W.3d 604, 608 (Tex. App.—Beaumont 2009, pet. ref'd) (concluding that vehicle search did not violate appellant's rights when driver consented to the search and appellant did not object), *cert. denied*, 558 U.S. 1124 (2010).

to search her belongings because a request for consent to search indicates to a reasonable person that she has the right to refuse consent.").

Nothing in the record shows that Norton was physically mistreated, deceived, or promised anything for his consent, or that he lacked the physical and mental condition and capacity to give consent. *See Meekins*, 340 S.W.3d at 460 n.26.

With regard to whether Trooper Brasher's comment to Norton that he carried a gun prevented his objection to the search, the trial court had discretion to interpret what the officer meant by this statement.[17] Norton admitted during the hearing that neither Trooper Brasher nor any other trooper at the scene pulled a gun on him, his girlfriend, or her son. Norton was never placed on the ground with his hands behind his head or in any other submissive position prior to his giving of consent to search. Therefore, the trial court could have reasonably concluded that the troopers did not use violence, threats, or threats of violence to obtain Norton's consent to search the vehicle. *See id.*

Additionally, Norton points out that Trooper Brasher knew he had been searched earlier and did not want to be searched again.[18] But there is a

---

[17]The dashboard camera DVD shows that Norton had already given consent to search twice before Trooper Brasher said, "I always go on this side [unintelligible remark] . . . I carry a gun."

[18]It is clear from the dashboard camera recording that Trooper Brasher did know that Norton did not want to undergo another search of the vehicle. On it Trooper Brasher tells Trooper Bening that "I asked [Norton] for consent to search

13

distinction between not wanting something to happen and refusing to permit something to happen.  A person may not particularly want his or her vehicle to be searched but may nevertheless consent to it.[19]  *See id.* at 457, 463–64 (observing that the defendant demonstrated reluctance to consent to the search through evasive answers to five requests for consent during a 30-second interlude before finally consenting after the officer demanded a "yes or no" response on the sixth request; the court acknowledged that reluctant consent may nevertheless be voluntary, holding that "repeatedly asking for consent does not result in coercion, particularly when the person refuses to answer or is otherwise evasive in his response" and that "mere acquiescence" may constitute consent).

Furthermore, the legal standard is not what Trooper Brasher subjectively knew but rather what a typical reasonable person would have understood by the exchange between the trooper and Norton.  *See id.* at 459.  But, finally, even assuming more than one permissible view exists under the totality of these circumstances, the standard of review requires that we give deference to the trial

---

the vehicle and he's like 'well I don't really want to get searched again . . . this other trooper down the road just stopped me . . . .'"

[19]Trooper Brasher's remarks to Trooper Bening illustrate this point.  After Trooper Brasher related to Trooper Bening that Norton "[didn't] really want to get searched again," he goes on to add "he said I could go ahead so I'm still going to go ahead and take a look."

court's view of the evidence. *See id.* at 460, 465. Therefore, we conclude that the trial court did not err by finding Norton's consent valid.

Norton also complains about the scope of the search, particularly the vehicle's trunk, where the methamphetamine was found inside a bag. However, absent a suspect's limiting of his consent to search to a particular area of a vehicle, such as the trunk or passenger compartment, a request to search "the car" reasonably includes all areas of the vehicle. *State v. Garrett*, 177 S.W.3d 652, 657 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *cf. Shelton v. State*, No. 02-07-00437-CR, 2009 WL 614506, at *1, *3–5 (Tex. App.—Fort Worth Mar. 5, 2009, pet. ref'd) (mem. op. on reh'g, not designated for publication) (reversing denial of motion to suppress when a reasonable person could have interpreted appellant's statements that he would open up the trunk as a limitation on his consent, authorizing a search of the trunk only). Here, Norton did not limit his consent to search to just the vehicle's passenger compartment, and he did not limit his consent to exclude any particular bag, or specifically the bag in which methamphetamine was found. *See Lemons v. State*, 298 S.W.3d 658, 661 (Tex. App.—Tyler 2009, pet. ref'd) (stating that if an officer makes a general request to search and the individual consents, knowing that there are unlocked containers in the car, the individual should expressly limit his consent to the vehicle but not the containers or, at the very least, object when the officer begins to open the container).

As set out above, the record supports the trial court's finding that Norton was not coerced or threatened in any way into giving consent before the suspected methamphetamine was located in the trunk.[20]

Based on this record, the trial court did not err by concluding that there was a valid traffic stop followed by a consensual search until the point that the methamphetamine was discovered in Norton's bag. Therefore, we overrule Norton's remaining point.

## IV. Conclusion

Having overruled Norton's remaining point, we affirm the trial court's order denying Norton's motion to suppress.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

---

[20]In his brief, Norton argues that his consent to search was not voluntary because "the search of the bag from which the contraband was recovered was not obtained until the troopers' [sic] told him that if he did not hand over the key they would just cut it open." This argument is specious for three reasons, all of which are clearly shown on the dashboard camera recording: (1) Trooper Moore's statement regarding cutting open a bag was directed at Jennifer, not Norton, (2) the methamphetamine was located in an unlocked bag, not in the locked bag that Trooper Brasher and Norton had discussed, and (3) most importantly, the comment by Trooper Moore to Jennifer that they could "cut open" one of the bags occurred 2 minutes and 20 seconds after Trooper Moore first confronted Norton about the methamphetamine that he had already found. Thus, the complained-of comment could not have played any part in the voluntariness of the consent obtained prior to the discovery of the methamphetamine. *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.03(a)(1) & cmt. 2–3, *reprinted in* Tex. Gov't Code Ann. tit. 2, subtit. G, app. A (West 2013) (Tex. State Bar R. art. X, § 9).

PANEL:  WALKER, MEIER, and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 20, 2015